HELEN ANGERMEIER, WILBUR E. ANGERMEIER AND
INEZ ANGERMEIER, HIS WIFE, PLAINTIFFS-RESPOND-
ENTS, v. BOROUGH OF SEA GIRT, A MUNICIPAL COR-
PORATION IN THE COUNTY OF MONMOUTH, AND
HERMAN STRUDWICK, BUILDING INSPECTOR OF THE
BOROUGH OF SEA GIRT, DEFENDANTS-APPELLANTS.

Argued April 21, 1958—Decided June 9, 1958.

*Mr. Robert V. Carton* argued the cause for the appellants (*Messrs. Herbert & Isherwood,* attorneys).

*Mr. Jerome S. Lieb* argued the cause for the respondents (*Messrs. Harkavy and Lieb,* attorneys).

The opinion of the court was delivered by

HEHER, J. There was judgment for the plaintiffs in this proceeding in lieu of the prerogative writ of *mandamus* directing the defendant borough to "recognize" a lot division of lands situate on the northerly side of Beacon Boulevard in the Borough of Sea Girt, acquired by the plaintiff Helen

Angermeier on May 11, 1946, designated on the borough's assessment map as Lots Nos. 13 and 14, Block 68, according to a conveyance of a portion of the lands made November 3, 1955 by Helen Angermeier to her co-plaintiffs, Wilbur E. Angermeier and Inez Angermeier, his wife, and to "treat" the land latterly conveyed "as a separate and independent lot or plot to be designated on the tax maps of the Borough as Block 68, S. 157', Lots 13 and 14," and the land retained by Helen Angermeier "as a separate and independent lot or plot to be designated on [the] tax maps as Block 68, N. 150', Lots 13 and 14"; and also to issue a building permit to Wilbur E. Angermeier and Inez Angermeier for the alteration and improvement of a "structure" presently on the southerly portion of Lots 13 and 14 in accordance with plans and specifications filed with the Borough October 30, 1956.

We certified, *sua sponte,* defendants' appeal to the Appellate Division of the Superior Court.

The vice of the judgment, the borough says, is that it "creates a lot that does not have the foot frontage required" by the borough's zoning ordinance and sanctions "two one-family dwelling units on the lot that is zoned for one-family dwellings."

Lots 13 and 14, as acquired by Helen Angermeier, consisted of two adjacent 25-foot lots fronting on the northerly side of Beacon Boulevard and extending the same width of 50 feet northwardly, between parallel side lines, 299.33 feet on the west and 322.33 feet on the east. The northerly boundary of the tract, according to the findings, "is located near Wreck Pond, a tidal body of water, but the Borough * * * owns a strip of land between the northerly end of the Angermeier lots and the edge of Wreck Pond"; and "[a]t the time of acquisition by Mrs. Angermeier, the property was improved by a two-story frame dwelling located near the northerly end of the property, with the front of the house facing Wreck Pond and the rear of the house to Beacon Boulevard, plus a garage with living apartments above located toward the southerly portion of the lots * * *."

In the early part of May 1955 Helen Angermeier applied to the local governing body "for approval of a subdivision of the property into two plots, the one plot to have a frontage of fifty feet on Beacon Boulevard and a depth of 157 feet, which plot would contain the garage apartment, and the other plot being that portion of the two lots lying northwardly of the first plot and having a depth of 153.83 feet." The application was denied.

Then came the conveyance, November 3, 1955, by Helen Angermeier to Wilbur E. and Inez Angermeier, of the southerly portion of the tract, fronting 50 feet on Beacon Boulevard and extending northwardly a depth of 157 feet. The deed "reserved" to the grantor, Helen, "a ten-foot easement for a right of way from the northerly of the two plots through the most southerly plot out to Beacon Boulevard, a public highway."

It was stipulated that "two pedestrian lanes [each five feet wide] lead into the property from Beacon Boulevard, namely, the one lane running north and south between lots 10 and 11 shown [on the map, Ex. P-9] and the other running parallel to the first lane, running between lots 24 and 25."

On or about October 30, 1956 Wilbur E. Angermeier submitted to the defendant building inspector plans and specifications for the "enlargement and improvement" of the garage and living quarters on the land thus conveyed to him. A building permit was refused. There was no appeal to the local board of adjustment.

The building inspector testified in this proceeding that the proposed plans were "all right," save that "they violated the zoning ordinance which prohibits a second dwelling on a single plot," and the governing body had "rejected the application for a subdivision of the plot."

There was testimony, and the judge found as a fact, that "while the easement for a right of way reserved by Helen Angermeier extends along the most easterly side of the whole plot out to Beacon Boulevard, in fact she actually uses the

driveway that has existed for years from her dwelling house out to Beacon Boulevard, which intersects the boulevard somewhere near the middle of the plot, and that in fact there is only one driveway being used for access to the boulevard, namely, the same driveway that has been in use for years."

The lands are situated in Residence District No. 2 as delineated by the local zoning ordinance, limited by section 4 to single or one-family dwellings, as in Residence District No. 1. The requirements for these districts are much the same: in each "not more than one dwelling and one garage shall be erected on any one plot" having a minimum frontage of 50 feet; and "no attached or built-in garage" is permissible "nearer than five feet from the side lot line, nor nearer than five feet from the front building line of the plot upon which [the] garage shall be" erected or maintained, except on "such plots as front on two streets." In district No. 2, the "dwelling building" shall occupy not less than 10% of the plot, exclusive of an attached garage or porches, and the ground floor area of the dwelling house shall not be less than 750 square feet; and in district No. 1, the requirements in these respects are, respectively, 12½% and 937.50 square feet.

All lots on the north side of Beacon Boulevard in the vicinity of plaintiffs' lands extend from the boulevard to the borough-owned strip on the edge of Wreck Pond; and the residences on the lots there are also, for the most part, on the northerly portion of the lot, as is Helen Angermeier's, and the houses face toward Wreck Pond. Only two of these dwelling houses were built within the last 25 years; the others are 35 to 50 years old. The plot in question has the only garage apartment in the block. And nature seems to have given the area unique advantages for the use to which it has long been devoted.

An amendment of the zoning ordinance provides that the word "plot" in districts 1 and 2 has reference to "any parcel of ground with a minimum front of 50 feet, and in District 3 with a minimum front of 25 feet, if for business use, and

a minimum front of 50 feet if for residential use as mapped on a map" therein identified; and that in no case shall the owner of a plot "rearrange said plot other than is now set forth on said map without the permission of the Mayor and Council" of the borough, the application for which shall be accompanied by a map "of the plot as changed," prepared and certified by a licensed engineer of New Jersey.

Sea Girt has not established a planning board in the exercise of the power granted by *R. S.* 40:55–1 *et seq.*, deeming that course to be impolitic and unnecessary for reasons to be stated *infra*.

The rationale of the judgment under review is to be found in these conclusions: "By means of an amendment to its Zoning Ordinance, the Borough has attempted to control the subdivision of lands within its borders"; zoning "is a separation of the municipality into districts and the regulation of buildings and structures and uses within such districts"; the Borough "has not taken advantage of the statutory provision for creation of a Planning Board" (*R. S.* 40:55–1 *et seq.*); it "has no master plan for the development of the Borough" (*R. S.* 40:55–6); it "may not lawfully exercise the powers of a Planning Board without a compliance with the statute cited," referring to *Magnolia Development Co. v. Coles*, 10 *N. J.* 223 (1952); *City of Rahway v. Raritan Homes*, 21 *N. J. Super.* 541 (*App. Div.* 1952); *City of Newark v. Padula*, 26 *N. J. Super.* 251 (*App. Div.* 1953); and, furthermore, the amended ordinance "prohibiting the rearrangement or subdivision of a plot without the permission of the Mayor and Council of the Borough sets up no norm or standard to guide or control the action of that body in granting or withholding permission, but leaves the matter entirely to the uncontrolled discretion of the Mayor and Council," and so is invalid, citing *Lipkin v. Duffy*, 119 *N. J. L.* 366 (*E. & A.* 1937); *Raritan Township v. Hubb Motors, Inc.*, 26 *N. J. Super.* 409 (*App. Div.* 1953); *Antonelli Construction, Inc., v. Milstead*, 34 *N. J. Super.* 449 (*Law Div.* 1955).

## I.

The point is made that "subdivision is normally a part of planning, not zoning," and the zoning ordinance "was insufficient to adequately restrict subdivision."

And the argument is that "[w]here subdivision relates to planning and not zoning," the municipality "must comply with the conditions, standards, procedures and regulations enumerated" in the Municipal Planning Act of 1953, *L.* 1953, *c.* 433, *N. J. S. A.* 40:55–1.1 *et seq.,* and that here the borough, having "failed to take advantage of the statute by establishing a planning board * * * did not possess the power it attempted to exercise in refusing to recognize plaintiff's subdivision of her property," and the borough cannot "cure this defect" by including "such provisions" in its zoning ordinance.

Reference is made to section 2 of the borough's zoning ordinance, providing that "In no case shall the owner of a plot rearrange said plot other than is now set forth on [the Borough's] map without the permission of the Mayor and Council"; and it is urged that this provision "does not pertain to the separation of the property into districts and the regulation of buildings and structures as defined" in *Mansfield & Swett, Inc., v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.* 1938), but, to the contrary, can be viewed only "as an abortive attempt for planning under the guise of the zoning power, and hence, must fail." Contending that "subdivision is normally a part of planning, not zoning," but that "in certain cases, the incidental result of the proper drafting and enforcement of a zoning ordinance may be a proper limitation upon subdivision," it is insisted that the ordinance here "is not an example of such proper drafting and enforcement." It is said that "the principle of strict construction applies," and that, at all events, the "restrictive portion" of the ordinance is unconstitutional for want of "standards pertaining to the permission to be granted

by the Mayor and Council," and so there is "nothing in the zoning ordinance to restrict the landowner from the subdivision of his property."

■ But the operation of the Municipal Planning Act is optional or permissive, just as the Zoning Act, *R. S.* 40 :55–30 *et seq.,* is itself essentially elective. The use of the permissive rather than the imperative verb and the nature of the delegated power are conclusive of this intent and purpose.

The local governing body, *L.* 1953, *c.* 433, § 4, *N. J. S. A.* 40 :55–1.4, "may by ordinance create" a planning board as therein conceived. The board so constituted, *sec.* 10, *N. J. S. A.* 40 :55–1.10, "may prepare, and after public hearing, adopt, and from time to time amend, a master plan for the physical development of the municipality which generally shall comprise land use, circulation, and a report presenting the objectives, assumptions, standards and principles which are embodied in the various interlocking portions of the master plan," the master plan to be "a composite of the one or more mapped and written proposals recommending the physical development of the municipality which the planning board shall have adopted either as a whole or severally after public hearing," thus comporting with the definition of "master plan" given in *sec.* 2, *N. J. S. A.* 40 :55–1.2; and the master plan so adopted "may include proposals for various stages in the future development of the municipality."

The "scope [of] the master plan," *sec.* 11, *N. J. S. A.* 40 :55–1.11, again in terms permissive in form, "may cover [enumerated] proposals" relating to (a) the use of land and buildings—"residential, commercial, industrial, mining, agricultural, park, and other like matters"; (b) services— "water supply, utilities, sewerage, and other like matters"; (c) transportation—"streets, parking, public transit, freight facilities, airports, and other like matters"; (d) housing— "residential standards, slum clearance and redevelopment, and other like matters"; (e) conservation—"water, forest, soil, flood control, and other like matters"; (f) public and semi-public facilities—"civic center, schools, libraries, parks, playgrounds, fire houses, police structures, hospitals, and

other like matters"; (g) the distribution and density of population; (h) other elements of municipal growth and development.

The master plan, *Ibid., sec.* 11, may also include in its scope "areas outside the boundaries of the municipality which the planning board deems to bear an essential relation to the planning of the municipality"; and the "studies in connection with the master plan shall be conducted wherever possible with the co-operation of adjacent planning agencies."

In the preparation of the master plan, *sec.* 12, *N. J. S. A.* 40 :55–1.12, "the planning board shall give due consideration to the probable ability of the municipality to carry out, over a period of years, the various public or *quasi*-public projects embraced in the plan without the imposition of unreasonable financial burdens," and "shall cause to be made careful and comprehensive surveys and studies of present conditions and the prospects for future growth of the municipality." And the master plan shall be made with "the general purpose of guiding and accomplishing a co-ordinated, adjusted and harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, morals, order, convenience, prosperity and general welfare, as well as efficiency and economy in the process of development and the maintenance of property values previously established"; and, to that end, the master plan shall also include "adequate provision for traffic and recreation, the promotion of safety from fire and other dangers," and "for light and air, the promotion of good civic design and arrangements, the wise and efficient expenditure of public funds," and "for public utilities and other public requirements."

The predecessor statute, *L.* 1930, *c.* 235, *R. S.* (1937) 40 :55–1 *et seq.*, as amended by *L.* 1948, *c.* 464; *L.* 1949, *c.* 157; *L.* 1950, *c.* 67; and *L.* 1951, *c.* 213, also provided, in permissive terms, for the creation by local ordinance of a planning board empowered in somewhat similar language but less extensive in coverage, *secs.* 2, 5, to "make and adopt

a master plan for the physical development of the municipality," including "outside" areas "bear[ing] essential relation" to its own planning.

And *R. S.* 40:55–35, as amended by *L.* 1948, *c.* 305, provides for the submission of certain amendments and changes in zoning regulations to the planning board, "when such board exists, * * *."

Although sometimes deemed a single conception, planning and zoning do not cover identical fields of municipal endeavor. While municipal planning embraces zoning, the converse does not hold true. They are not convertible terms. Zoning is not devoid of planning, but it does not include the whole of planning. Zoning is a separation of the municipality into districts, and the regulation of buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land. This is the constitutional sense of the term. 1947 *State Constitution, Art.* IV, *sec.* VI, *par.* 2. Planning has a much broader connotation. It has in view, as we have seen, the physical development of the community and its environs in relation to its social and economic well-being for the fulfillment of the rightful common destiny, according to a "master plan" based on "careful and comprehensive surveys and studies of present conditions and the prospects of future growth of the municipality," and embodying scientific teachings and creative experience. In a word, this is an exercise of the State's inherent authority, antedating the *Constitution* itself, to have recourse to such measures as may serve the basic common moral and material needs. Planning to this end is as old as government itself—of the very essence of an ordered and civilized society. *Mansfield & Swett, Inc., v. Town of West Orange, supra.*

As Professor Haar has said in his notable contribution to the subject, *"In Accordance with a Comprehensive Plan,"* 68 *Harv. L. Rev.* 1154, 1156 (1955), the "city master plan is a long-term general outline of projected development; zoning is but one of the many tools which may be used to implement the plan." Yet but a few states have recognized

the "sequential relationship" by providing that zoning ordinances shall be "in accordance with the master plan for land use," as in Nevada, *Comp. Laws,* § 5063.12 *(Supp.* 1941); and New Jersey still provides, *R. S.* 40:55–32, that zoning regulations shall be in accordance with a "comprehensive plan and designed for one or more" of the enumerated considerations to be served by zoning. The Standard City Planning Enabling Act drafted in 1928 by an advisory committee to the Department of Commerce provides for a planning commission at the local level to formulate a "master plan" which commonly includes a "zone plan" or "zoning plan" for the "control of the height, area, bulk, location, and use of buildings and premises"; and the Standard State Zoning Enabling Act *(rev. ed.* 1926), recommended by the Department of Commerce, *sec.* 3, provides that zoning regulations shall be "in accordance with a comprehensive plan"; and there is this explanatory note to the section: "This will prevent haphazard or piecemeal zoning. No zoning should be done without such a comprehensive study."

The "comprehensive plan" of the zoning statute "is not identical with the 'master plan' of the Planning Act and need not meet the formal requirements of a master plan. The Zoning Act nowhere provides that the comprehensive plan shall exist in some physical form outside the ordinance itself." *Kozesnik v. Montgomery Township,* 24 *N. J.* 154, 166 (1957).

The Legislature has not made the formulation of a "master plan" under the Municipal Planning Act, *N. J. S. A.* 40:55–1.1 *et seq.,* a precondition to the exercise of the delegated use-zoning control, *R. S.* 40:55–30 *et seq.;* nor is the constitutional use-zoning process so conditioned. We have no occasion now to analyze the remaining provisions of the planning act. It suffices to say that there is none militating against the view that the "master plan" is an optional instrument of local government. Professor Haar, *Ibid., p.* 1175, observes that if the master plan is to have "a directly controlling influence on zoning regulation, it would appear necessary to have it legislatively adopted, rather than merely

stated by the planning authorities and functioning as an interesting study without much direct relevance to day-to-day activity"; and while in the past there has been fear that "legislative adoption and amendment might prove overly cumbersome," and it has been suggested that the local legislature be excluded from "such direct participation at the planning level," yet "it would seem that only where the master plan is not to have any legal effect on private property rights could it be left entirely to the planning commission," for "if it is to be the standard whereby the validity of subsequent regulation is judged, leaving it entirely to the planners would in effect give them conclusive control over the legislature in the zoning area."

■ And the borough denies the need for recourse to the Municipal Planning Act. Sea Girt is a small municipality bordering on the Atlantic Ocean, "nearly 100% developed," it is said. It has an ocean frontage of a little less than a mile, and a depth of approximately one mile. Its population in 1950 was 1,122, estimated at 1,355 in 1955. Its growth has not been great, and it will of necessity be limited in the future; it is now "pretty well filled up"; it "is entirely laid out and divided into lots and has been ever since 1927." The lots total 2,911; 35 lots are devoted to business; there are roughly 1,500 50-foot lots, and the remainder are 25-foot lots. There are but 50 scattered vacant lots, a small central business area, and three hotels and six rooming houses which are all non-conforming uses. The borough is otherwise a one-family residence community, the houses ranging in value from $10,000 to $50,000.

It would be an arbitrary construction that would in such circumstances render the creation of a planning board for the formulation of a "master plan" a *sine qua non* to the exercise of the use-zoning process; and the example emphasizes the legislative use of the symbols of expression in their normal sense.

"Subdivision" in the regulation of land use pursuant to the constitutional and statutory zoning policy is not subject to the planning act where, as here, its provisions have not

been invoked by the local legislative authority in the manner ordained in the act.

## II.

■ And the invalidity of the provision of section 2 of the zoning ordinance conditioning the "rearrangement" of a plot on "permission" given by the mayor and council, as purporting to confer arbitrary power, does not affect the ordinance otherwise.

■ The principle of separability is in aid of the intention of the lawgiver. The inquiry is whether the law-making body designed that the enactment should stand or fall as a unitary whole. It is not enough that the act is severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention. It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone. A severability clause (there was none such here) "provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command." *Dorchy v. State of Kansas*, 264 *U. S.* 286, 44 *S. Ct.* 323, 68 *L. Ed.* 686 (1924). Absent such express declaration, an unconstitutional provision of a statute does not affect the validity of another provision of the enactment, if otherwise valid, unless the two are so intimately connected and dependent upon each other as to raise the presumption that the Legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional and the objectionable feature can be excised without substantial impairment of the general purpose, the statute is operative except in so far as it may contravene fundamental law. *St. John The Baptist Greek Catholic Church of Perth Amboy v. Gengor*, 121 *N. J. Eq.* 349 (*E. & A.* 1937); *State v. Doto*, 10 *N. J.* 318 (1952).

So assayed, the excision of the tainted provision has no effect upon the ordinance otherwise; the contrary hypothesis

would do violence to the essential reason and spirit of the local legislative policy.

### III.

But plaintiffs insist that, for other reasons concerned with the requirements of the zoning ordinance, *e. g.,* the single-family dwelling and driveway limitations and the minimum street frontage provision, the denial of leave to subdivide was arbitrary and unreasonable.

These issues were not resolved by the judgment under review; and we conceive it to be the better course to reverse the judgment and remand the cause for the taking of such further action as the plaintiffs may be advised in the light of the foregoing principles, either by invoking the statutory jurisdiction of the board of adjustment, if such there be in the circumstances, or by litigating in this proceeding the unresolved issue of arbitrary interference with the use of the land. See *Kozesnik v. Montgomery Township, supra,* 24 *N. J.* at *page* 183.

Reversed and remanded.

WACHENFELD, J., concurring in result.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING and FRANCIS —5.

*For affirmance*—None.