[Civ. No. 28265. Second Dist., Div. One. Jan. 21, 1965.]

GLEN M. O'LOANE et al., Plaintiffs and Respondents, v. LAWRENCE W. O'ROURKE, as City Clerk, etc., et al., Defendants and Appellants.

William Camil, City Attorney, for Defendants and Appellants.

Bailie, Turner, Lake & Sprague and Richard R. Clements for Plaintiffs and Respondents.

Elmer Patrick Friel as Amicus Curiae on behalf of Plaintiffs and Respondents.

FOURT, J.—This is an appeal from a judgment in a mandate proceeding wherein it was ordered, among other things, that the City Council of the City of Commerce either repeal a resolution which adopted a "general plan" or submit the same to a vote of the electors.

In a petition for a writ of mandate, petitioners allege, among other things, that they are electors of the City of Commerce (hereinafter referred to as city) and entitled to vote in any referendum election in the city; that the city is organized under the general laws of the state and has no particular charter provisions for referendum of any legislative enact-

ments of the city council of the city; that O'Rourke is the city clerk of the city and the other named defendants are members of the city council (hereinafter referred to as council) of the city; that the council adopted a resolution entitled "A Resolution Of The City Council Of The City of Commerce Approving A General Plan"; that the petitioners, with other qualified electors, circulated a petition against the resolution and petitioned the council to repeal the same or submit it to the vote of the electors of the city; that on September 18, 1963, the petition was filed with the clerk of the city and it bore the signatures of 632 electors of the city; that the total number of electors in the city is 3,267. It is further set forth that the clerk refused to examine the petition to determine whether it was signed by the requisite number of electors and referred the same to the council; that the council considered the petition and determined that the resolution was not a proper subject to be referred to the electorate and tabled the petitions; that the council failed to repeal the resolution or to take steps to submit the same to the vote of the electorate: there then followed a prayer in the petition for mandate that the court command the clerk to examine the petitions and ascertain whether they were signed by the requisite number of electors and that the council reconsider the resolution and either repeal the same or submit it to the vote of the electors of the city.

An answer was filed by the clerk and the council wherein they denied, in effect, that petitioners had circulated a petition protesting the resolution, denied that the petition was circulated and signed by qualified electors and denied, in effect, that the petition contained the signatures of 632 electors and that there were 3,267 electors in the city. The answer also alleged that no cause of action was stated and that "the adoption of a general plan is not a subject of referendum under the laws of the State of California," and that a resolution, as distinguished from an ordinance, is not subject to referendum. Defendants, in substantially all other respects, in effect admitted the allegations of the petition for the writ of mandate.

The trial judge, after a hearing, made findings of fact and conclusions of law.[1]

---

[1]"FINDINGS OF FACT

"I

"That Petitioners are residents, freeholders, and legally qualified electors of the City of Commerce, County of Los Angeles, State of

A judgment following the findings and conclusions was made and entered, and, in effect, ordered the clerk to examine the registration records and to ascertain whether the persons who signed the petitions are qualified voters of the city, to fairly determine if the petitions set forth the date required by the Elections Code, to transmit the petitions to the council and mayor properly certified if the petitions are sufficient, and to make known to the court how he has executed the writ of the court. The judgment further ordered the mayor and the council to reconsider the resolution and either repeal the same or submit it to the vote of the electors of the city, and to make known to the court, at a date to be set, what they have done.

 This appeal followed. There apparently is no reporter's transcript of the proceedings at the trial. With refer-

California, and as such are entitled to vote at any election for municipal officers in said City and to vote at any referendum election which may be called therein.

"II

"That the City of Commerce is a Municipal Corporation and duly organized under the laws of the State of California, and under the provisions of the general laws of the State of California and that said City has no charter provisions for referendum of a legislative enactment to electorate; such referendum of said legislative enactment is governed by Division 4 of the Elections Code of the State of California.

"III

"That at all times herein mentioned, LAWRENCE O'ROURKE was the duly appointed, qualified and acting Clerk of the City of Commerce; that MAURICE H. QUIGLEY was the duly elected, qualified and acting Mayor of said City; that CHARLES F. SCHEIBLER, JAMES W. BRISTOW, ROBERT B. SALERNO, and GEORGE H. CHAVEZ, and each of them, were the duly elected, qualified and acting City Councilmen of said City. That the legislative powers of said City are and at all times herein mentioned have been in said Mayor and Councilmen.

"IV

"That on August 19, 1963, said City Council duly adopted Resolution No. 63-22 entitled 'A Resolution of the City Council of the City of Commerce Approving a General Plan.'

"V

"That immediately after said adoption, said Petitioners, in conjunction with other qualified electors of said City, prepared, circulated and signed a Petition protesting against the passage of said ordinance and petitioning that said ordinance be forthwith repealed or that the same submitted to the vote of the qualified and registered electors of the City of Commerce as provided by law.

"VI

"That on September 12, 1963, said Petition was filed with the Respondent City Clerk. That said Petition purported to bear the signatures of 633 electors of said City of Commerce. That the total electorate of said City of Comerce is 3,267 electors.

"VII

"That the Respondent City Clerk failed and refused to examine said

ence to the record appellants desired in the appeal, notice was given to prepare a reporter's transcript (apparently knowing there was none to be had) and (pursuant to rule 5(a) of Cal. Rules of Court) the judgment roll, the proposed findings of fact and conclusions of law prepared and submitted by the petitioners, the findings of fact and conclusions of law as signed, the objections to said findings of fact and conclusions of law, the proposed formal judgment, points and authorities in opposition to the petition, the decision and judgment of the court and the copy of the general plan. Respondents requested, in addition to the matters mentioned, that their points and authorities in support of the petition, an amicus curiae brief, a copy of the supplemental notice of appeal and a letter from the amicus curiae to the judge be included in the record.

Appellants now assert that in a general law city the adoption

petition so as to ascertain whether or not said petition was signed by the requisite number of qualified and registered electors, to wit, 327. That said City Clerk did, however, set and place the petition before the aforesaid Mayor and City Council, and each of them, at the next regularly scheduled meeting of that body on September 16, 1963.

''VIII

''That said petition was in the form required by law.

''IX

''That said City Council and Mayor in the regular course of said meeting, duly considered said petition and were urged to reconsider said resolution, rescind the same or to refer the same to the voters of the City of Commerce. That said City Council, after obtaining an opinion from the City Attorney of the City of Commerce, that the aforesaid resolution was not a proper subject to be referred to the electorate, accepted and passed a seconded motion to table and file said petition indefinitely.

''X

''That said Mayor and Councilmen, individually and as a body, have failed and neglected to reconsider the aforesaid resolution and to repeal the same, or to take steps to submit the same to the vote of the electorate and, although formal demand was made, on or about September 16, 1963, on said officials, they did fail, neglect and refuse to reconsider said resolution or to repeal the same and have refused to submit the same to the vote of the electors of said City either at the next general municipal election or at any special municipal election called for that purpose, and said refusal is in violation of Division 4 of the Elections Code of the State of California.

''XI

''That petitioners have no plain, speedy, or adequate remedy at law.

''CONCLUSIONS OF LAW

''I

''The Petition states facts sufficient to constitute a cause of action for mandamus.

''II

''The adoption of a master plan has legislative effect; after its adoption all public buildings, streets, improvements, parks, etc., must

of a general plan is not subject to referendum, and, further, that even if such a proceeding is subject to referendum, in this particular case the evidence does not support the findings.

With reference to the claim of lack of evidence to support the findings, under the circumstances of this case, as here presented, this court must and does presume that the trial court received evidence which supports its findings. (*White* v. *Jones,* 136 Cal.App.2d 567, 571 [288 P.2d 913]; *Dumas* v. *Stark,* 56 Cal.2d 673, 674 [16 Cal.Rptr. 368, 365 P.2d 424]; *Hearst Publishing Co.* v. *Abounader,* 196 Cal.App.2d 49, 55 [16 Cal.Rptr. 244].)

This court holds that under the circumstances of this appeal all intendments are in support of the judgment, and all proceedings necessary to its validity are presumed to have been taken, and any matters which might have been presented to the trial court which would have authorized the judgment will be presumed to have been thus presented, as the record before us shows nothing to the contrary.

Had the appellants wanted a court reporter to take down and transcribe the proceedings, it would have been an easy matter to request that such be done, or they otherwise could have brought a proper record to this court if it was intended to question the sufficiency of the evidence. There is no merit to the assertion that the evidence does not support the findings.

The real question in this case is whether, under the general law, the adoption by a city council of a general plan is subject to referendum.

Appellants argue that the adoption of the general plan under the applicable provisions of the Government Code (§§ 65400-65555) is not subject to the referendum, stating, in effect, that the general plan is not a zoning ordinance, that it has no legislative effect, that the adoption of such a plan is an administrative and executive act and not a legislative act.

The operation of the Planning Act is optional or permissive with the council. The statute states on its face that a city *may* have a planning commission; however, a planning

conform to the master plan in the view of the planning commission (Government Code 65551-55).

"III

"The adoption of a master plan is a local and municipal, as contrasted to a statewide, matter. Referendum is an appropriate procedure to review the adoption of the plan. (Reagan v. City of Sausalito, 210 CA 2d 618)."

commission is not necessarily required in a city. Planning and zoning do not necessarily cover identical fields of municipal endeavors. ■ In other words, the Legislature has not made the formulation of a general plan a precondition to the exercise of zoning control. ■ It is appropriately said in *Angermeier* v. *Borough of Sea Girt*, 27 N.J. 298 [142 A.2d 624, 629-630]:

". . . While *municipal planning embraces zoning,* the converse does not hold true. They are not convertible terms. Zoning is not devoid of planning, but it does not include the whole of planning. Zoning is a separation of the municipality into districts, and the regulation of buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land. This is the constitutional sense of the term. . . . *Planning* has a much broader connotation. *It has in view, as we have seen, the physical development of the community and its environs in relation to its social and economic well-being for the fulfillment of the rightful common destiny, according to a 'master plan' based on 'careful and comprehensive surveys and studies of present conditions and the prospects of future growth of the municipality,' and embodying scientific teaching and creative experience. In a word, this is an exercise of the State's inherent authority, antedating the Constitution* itself, to have recourse to such measures as may serve the basic common moral and material needs. Planning to this end is as old as government itself—of the very essence of an ordered and civilized society. . . .

■ "As Professor Haar has said in his notable contribution to the subject, *'In Accordance with a Comprehensive Plan,'* 68 Harv. L. Rev. 1154, 1156 (1955), the *'city master plan is a long-term general outline of projected development*: *zoning is but one of the many tools which may be used to implement the plan.'* . . ." (Italics added.)

Professor Haar in the article above cited (68 Harv. L. Rev. 1175) further states that if the master plan is to have ". . . a directly controlling influence on zoning regulation, it would appear necessary to have it *legislatively adopted,* rather than merely stated by the planning authorities and functioning as an interesting study without much direct relevance to day-to-day activity. In the past, the fear that legislative adoption and amendment might prove overly cumbersome has caused most planners to advise excluding the local legislature from such direct participation at the planning

level. Yet it would seem that only where the master plan is not to have any legal effect on private property rights could it be left entirely to the planning commission. For if it is to be the standard whereby the validity of subsequent regulation is judged, leaving it entirely to the planners would in effect give them conclusive control over the legislature in the zoning area.

*"The master plan symbolizes a change in the organization of the land market.* Its primary justification is an assumption that the interdependence of land uses in an industrialized society makes necessary *municipal controls over private property.* This is the challenge—to create an institutional arrangement which can give meaning to planning ideas by delimiting them for effective use in the enactment of regulatory ordinances, and which can supply the courts with a sensible and reasonably precise basis for evaluation and review.'' (Italics added.)

The general plan in this instance very definitely has a direct effect upon all of the property in the city and upon its future development. The plan sets out that it is to become ''the framework within which specific planning can be undertaken'' and to be the ''basis for the preparation of precise plans.'' The plan recognizes in this particular case that the city ''was largely developed before it was incorporated,'' however, it calls for the enhancing of recreational facilities and the expansion and consolidation of certain commercial activities. It is stated that there are about 10,000 residents of the city and about 75,000 persons who work in the industries located in the city and that the ''general plan is for the people.'' (Presumably for the ''people'' who are residents of the city and not the ''people'' who just work in the factories and do not live in the city.) It is contemplated by the plans that there will be ''higher skilled and better pay categories,'' a ''convenient walk-to-work arrangement,'' a gradual lessening of elementary school capacity and an increasing demand for ''adult cultural amenities, and more passive types of recreation.'' Further, it is indicated that due to population density, single-family dwellings will become apartment houses. Standards of density are set forth and ''[s]etbacks, driveways, walks, landscaping and service facilities would be controlled by the zoning or other ordinances *commensurate with the standards above.''* (Italics added.) It is anomalous that the general plan states that ''the objective element of the general plan indicates how the people want their City to

develop'' and that at the same time the council refuses to refer it to the people of the city for a vote on a referendum.

Under the title of ''Objectives'' in this plan, it is set forth that the city is about 6½ square miles in size with less than 10 per cent of the land vacant, that the land use pattern is firmly set; however, changes in the future ''should be made in accord with the following basic land use objectives.'' There then follow certain itemized provisions for ''anticipated future land use,'' reservations for living purposes of selected land, location of industry, rails, highways, power and water lines, etc. The plan envisions the reduction of single-family dwellings and ''as this occurs, development for a combination of high-rise and garden apartments and the closing of unnecessary streets should be encouraged to take advantage of the optimum use of the limited amount of residential land.'' Shopping centers are located on the general plan maps and business and commercial offices are set out for certain streets. Under the title of ''Circulation Element'' it is set forth, in effect, that the city under the circumstances has an unusual traffic problem is that there is a great deal of trucking and through highway travel. It is recommended in the plan that many street improvements be made, certain streets closed, grade separations made, and that certain private roads be dedicated to the public. The general plan also sets forth that ''after adoption of the General Plan, any subsequent determination made by the Planning Commission should first be reviewed as to its conformity with the General Plan'' and the council authorized ''to adopt and use the General Plan as a guide for orderly community growth and development and to systematically correct deficiencies in existing facilities and provide for needed facilities'' and further that ''the General Plan should be referred to as a guide in making decisions that affect the elements of the General Plan.'' Also, that ''implementation of the General Plan may be carried out by the City Council when it budgets and appropriates annually amounts to be expended for capital improvements'' as such latter are set forth, such as grade separations, highway changes, public buildings and drains, all as set forth in the plan.

It is apparent that the plan is, in short, a constitution for all future developments within the city. No mechanical reading of the plan itself is sufficient. To argue that property rights are not affected by the general plan (as the city so asserts) as adopted ignores that which is obvious. Any zoning

ordinance adopted in the future would surely be interpreted in part by its fidelity to the general plan as well as by the standards of due process. Frequently it has occurred that where a general plan was adopted, and later a zoning change was made which appeared to be in accord with the plan, that fact in and of itself was some evidentiary weight in the determination as to whether the zoning ordinance was proper or otherwise. If the general plan is anything at all, it is a meaningful enactment and definitely affects the community and, among other things, changes land market values. The general plan is legislatively adopted by the council. True, it is couched in part in general terms, but there are many specifics, and once adopted it becomes very effective. Many facets of activities between other public agencies and the city are effectively determined by the plan. Any subdivision or other development would necessarily be considered in its relation to the general plan, and such consideration practically by itself would be a sufficient legislative guide to the exercise of such discretions.

It surely cannot be contemplated that the council, in the adoption of future zoning ordinances (which are admittedly legislative and subject to referendum will go contrary, (in all but rare instances), to the general plan which it adopts.

The Constitution, article IV, section 1, provides for referendum. It is the exercise by the people of a power reserved to them, and not an exercise of a right granted to them. For that reason, and in order to protect the people of this state in the exercise of this reserved legislative power, the statutory provisions dealing with the referendum should be afforded liberal construction. (*Blotter* v. *Farrell*, 42 Cal.2d 804, 809 [270 P.2d 481].)

The matter of the adoption of a general plan in a city is purely a local matter and is not a matter of statewide legislative concern. (*Reagan* v. *City of Sausalito*, 210 Cal. App.2d 618, 624-625 [26 Cal.Rptr. 775]; *Fletcher* v. *Porter*, 203 Cal.App.2d 313, 318-320 [21 Cal.Rptr. 452].)

If the adoption of the general plan is legislative in character, then the referendum is available to the people.

In 62 Corpus Juris Secundum, Municipal Corporations, section 454, at pages 874-875, under the title of "Tests as to legislative or administrative acts" it is stated: "The form or name of an act of municipal authorities, such as whether it is called an ordinance or a resolution, is not determinative of its legislative or administrative nature, with respect to

whether or not it is subject to initiative and referendum. The following tests have been given for determining whether a particular action of the council belongs to one class or the other: Actions which relate to subjects of a permanent or general character are considered to be legislative, while those which are temporary in operation and effect are not. Acts constituting a declaration of public purpose or policy and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. As has been said, the crucial test is whether the proposed ordinance is one making a new law, or one executing a law already in existence; and acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved on it by the organic law of its existence. Furthermore, the distinction between legislative acts and those that are administrative is not destroyed by reason of the fact that the charter may require the latter to be accomplished by an ordinance instead of by resolution.''

In *Martin* v. *Smith,* 184 Cal.App.2d 571, 575 [7 Cal.Rptr. 725], it is said:

''Acts of a legislative body which are legislative in nature are subject to the referendum process, whereas acts which are administrative in nature are not. The difference between the two types of activity is set forth in *McKevitt* v. *City of Sacramento,* 55 Cal.App. 117, 124 [203 P. 132], as follows: 'Acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence.'

''McQuillin on Municipal Corporations (3d ed.), volume 5, pages 255-256, states: 'Again it has been said: ''The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.'' ' (Citing *Seaton* v. *Lackey,* 298 Ky. 188 [182 S.W.2d 336, 339].)''

It has been held that an ordinance which, in effect, clarifies

the duty of a planning commission with reference to the adoption of a general plan is of legislative character and can be initiated by the people. (*Fletcher* v. *Porter, supra,* 203 Cal.App.2d 313.)

The adoption of the general plan is, in effect, the adoption of a policy, and in many respects, entirely new policy. The plan is of permanent and general character, it is a declaration of public purpose and, as such, supposedly sets forth what kind of a city the community wants and, supposedly, represents the judgment of the electors of the city with reference to the physical form and character the city is to assume.

Under the circumstances we can discern no useful purpose which would be served by preventing the exercise of the democratic process, namely, the permitting a vote to be taken on the issue by the electorate of the city.

The judgment and order for the issuance of the peremptory writ of mandate is affirmed.

Wood, P. J., and Lillie, J., concurred.