[No. C000443. Third Dist. Sept. 6, 1989.]

L.I.F.E. COMMITTEE, Plaintiff and Respondent, v.
CITY OF LODI, Defendant and Appellant.

**COUNSEL**

Ronald M. Stein, Deputy City Attorney, Mark I. Weinberger, Shute, Mihally & Weinberger and Daniel P. Selmi for Defendant and Appellant.

Steven A. Herum, Neumiller & Beardslee, Daniel J. Curtin and McCutcheon, Doyle, Brown & Enerson for Plaintiff and Respondent.

**OPINION**

**PUGLIA, P. J.**—A city may make and enforce ordinances and regulations not in conflict with the general law of the state (Cal. Const., art. XI, § 7). In

this appeal we consider whether an initiative ordinance, presented to the electorate of the City of Lodi as Measure A, conforms with the implicit limitations of article XI, section 7 of the California Constitution. The ostensible purpose of Measure A is to protect and preserve agricultural land (Green Belt) located immediately outside the municipal boundaries of the City of Lodi, a general law city. Of particular concern is paragraph 5 of the initiative which requires an amendment to the land use element of the Lodi general plan to be approved in a citywide election before the City of Lodi may annex land in the Green Belt. The trial court found the ordinance in conflict with and therefore preempted by state annexation law. The court issued a peremptory writ of mandate commanding the City of Lodi to cease enforcing the provisions of Measure A. We shall affirm.

On August 25, 1981, the voters of the City of Lodi (City) approved an initiative ordinance designated as "Measure A."[1] Measure A establishes a "Green Belt," approximately one mile wide contiguous to the boundaries of and surrounding the City of Lodi and occupying the area between the City limits and the outer boundary of the City's sphere of influence. The sphere of influence is the area determined by the San Joaquin County Local Agency Formation Commission (LAFCO) as the "Probable ultimate physical boundaries and service area" of the City. (Former Gov. Code, § 54774 [now

---

[1] The complete text of Measure A reads as follows: "THE PEOPLE OF THE CITY OF LODI, CALIFORNIA DO ORDAIN AS FOLLOWS: [¶] 1. It shall be the policy of the City of Lodi to protect land in the Green Belt area in order to preserve and protect agricultural land, preserve the scenic value of the area, protect wildlife habitat and natural resources and to protect the small city character of Lodi. [¶] 2. The Green Belt area shall be designated as the area between the outer limits of the incorporated city and the outer limits of the adopted sphere of influence at the adoption of this ordinance. [¶] 3. To affect the policy of the City of Lodi to protect land in the Green Belt area, non-agricultural development in the City of Lodi which lies adjacent to the Green Belt area shall be permitted only after a finding by the City Council that such non-agricultural development will not interfere with the continued productive use of agricultural land in the Green Belt area or that an adequate buffer or mitigation zone exists to assure continued productive use of agricultural land in the Green Belt area. [¶] 4. At the time of adoption of this ordinance, the Green Belt area shall be removed from the existing Land Use Element of the General Plan of the City of Lodi. [¶] 5. Before land in the Green Belt area can be annexed by the City if [sic] Lodi, an amendment to the City's Land Use Element of the General Plan must be made and approved by a majority of the people voting in a [citywide] election. [¶] 6. Before any annexation proposal can be approved, the City Council must make the finding that the proposed annexation is contiguous to existing city boundaries and the projected demand from the proposed development in the area to be annexed will not exceed the service capacity of existing municipal utilities and services, the school district, and existing roadways. [¶] 7. Water, sewer, and electrical facilities shall not be expanded or extended until the City Council makes the finding that a proposed expansion or extension is consistent with the goals, policies and land use designations of the General Plan and this ordinance. [¶] 8. The City of Lodi may hold elections in consolidation with other scheduled elections in the City for the purpose of allowing voters to voice their opinions on amendments to the City's Land Use Element of the General Plan. [¶] 9. If any portion of this ordinance is hereafter determined to be invalid, all remaining portions of this ordinance shall remain in force and effect and to this extent the provisions of this ordinance are seperable [sic]."

§ 56076; Stats. 1985, ch. 541, § 3, p. 1929; see fn. 3, *post*]; all statutory references to sections of an undesignated code are to the Government Code.)

The stated purpose of Measure A is set forth in its first paragraph: "It shall be the policy of the City of Lodi to protect land in the Green Belt area in order to preserve and protect agricultural land, preserve the scenic value of the area, protect wildlife habitat and natural resources and to protect the small city character of Lodi." As described in the official ballot arguments of its proponents, Measure A is a tool for ensuring "reasonable, orderly growth," as contrasted with "[r]esidential expansion into prime farmland, far exceeding any need."

The crux of Measure A is contained in its paragraphs 4, 5 and 6. Paragraph 4 removes the Green Belt from the existing land use element of the City's general plan leaving no land use designation. Paragraph 6 in effect requires that any annexation must be in the Green Belt. Paragraph 5 states: "Before land in the Green Belt area can be annexed by the City [of] Lodi, an amendment to the City's Land Use Element of the General Plan must be made and approved by a majority of the people voting in a [citywide] election."

Paragraph 8 provides the City "may hold elections in consolidation with other scheduled elections in the City for the purpose of allowing voters to voice their opinions on amendments to the City's Land Use Element of the General Plan."[2]

Respondent L.I.F.E. Committee (plaintiff) filed a petition for writ of mandamus and complaint for declaratory relief (complaint), seeking to overturn Measure A. The complaint alleges Measure A is invalid because it conflicts with the annexation process established by state law; specifically, that under Measure A, a proposed annexation may not go forward until a majority of the City voters approve an amendment to the land use element of the City's general plan.

Plaintiff and City filed cross-motions for summary judgment. Following hearing and argument, the trial court ruled that "Measure A is invalid under current state law" and void on its face as an unlawful interference with the process of state-established annexation procedures.

---

[2] In this opinion we consider the effect on the constitutionality of Measure A of its requirement of voter approval of a general plan amendment as a condition to annexation. Although Measure A has a severability clause, we have no occasion to decide whether other parts of Measure A survive our holding that the provision for election in paragraph 5 is invalid as in conflict with paramount state law. The reason for this is that on appeal, as in the trial court, the City adopts an all or nothing position, neither raising nor briefing the issue of severability.

## I

City contends an essential but erroneous premise of the trial court's reasoning is that Measure A "requires a vote relating to annexation" and thus conflicts with state annexation law. City maintains the vote required by Measure A does not concern proposed annexation but relates to land use planning and allows Lodi residents to vote on general plan amendments. City notes the adoption of or amendment to a general plan has traditionally been held to be subject to the exercise of the initiative power. (*O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774, 783-785 [42 Cal.Rptr. 283].) Moreover, while acknowledging a vote is required under Measure A before land in the Green Belt can be annexed, City asserts it interprets this provision as simply setting the *time* at which *a vote on the general plan* is to occur. Thus, City contends that under its implementation of the initiative ordinance, the vote on the general plan does not interfere with or affect state annexation procedures. For numerous reasons we disagree.

"[I]n matters of statewide concern, where the [ ] Legislature has exhibited the intent or purpose to occupy the field to the exclusion of municipal regulation, the city lacks authority to legislate under the preemption doctrine." (*Ferrini* v. *City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 246 [197 Cal.Rptr. 694]; cited with approval, *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 516 [247 Cal.Rptr. 362, 754 P.2d 708].) There is no question but that the Legislature intended to occupy the field with regard to annexation. (See *Ferrini,* at pp. 246-249.)

The annexation of territory by a city has long been held to be both a legislative matter and a matter of statewide concern. (*Ferrini,* at p. 246; *People* v. *City of Long Beach* (1909) 155 Cal. 604, 610 [102 P. 664]; *County of San Mateo* v. *City Council* (1959) 168 Cal.App.2d 220, 224 [335 P.2d 1013].) Indeed, the state Constitution directs the Legislature to "prescribe uniform procedure for city formation and provide for city powers." (Cal. Const., art. XI, § 2, subd. (a).) The city electorate does not have an absolute right to vote on annexation, as "it is well established that the state may create, expand, diminish or totally abolish municipal corporations with or without the consent of its citizens, or even against their protest." (*Scuri* v. *Board of Supervisors* (1982) 134 Cal.App.3d 400, 404-405 [185 Cal.Rptr. 18].) "The Legislature need make no provision for elections in annexation proceedings . . . ." (*Ferrini, supra,* 150 Cal.App.3d at p. 245.)

Prior to 1963 "annexation controversies took on the appearance of 'a kind of warfare in which the unincorporated suburbs of the state have been both the prize and battleground, the annexation process a tactic, the

location of annexation boundaries a significant weapon, and their calculated manipulation a commonplace event.' " (*Citizens Against Forced Annexation v. Local Agency Formation Com.* (1982) 32 Cal.3d 816, 828 [187 Cal.Rptr. 423, 654 P.2d 193], quoting *Tillie Lewis Foods, Inc.* v. *City of Pittsburg* (1975) 52 Cal.App.3d 983, 995 [124 Cal.Rptr. 698].)

In 1965, the Legislature adopted the Knox-Nisbet Act (former §§ 54773-54799.5; Stats. 1985, ch. 541, § 2, p. 1920) to discourage urban sprawl and encourage the orderly formation and development of local government agencies based upon local conditions and circumstances. This act provided for the establishment of a local agency formation commission (LAFCO) in every county, with the power to review and approve or disapprove with or without amendment, wholly, partially, or conditionally, proposals for the annexation of territory to a city. (*Ferrini, supra,* 150 Cal.App.3d at pp. 243-244; Guide to Cortese/Knox Local Government Reorganization Act of 1985, Assem. Com. on Local Gov. (1987 rev.) p. 213.)

In 1977 the Legislature enacted the Municipal Organization Act of 1977, former sections 35000 to 35500 (MORGA), which embodied the exclusive procedure for annexation of territory to a city. (*Ferrini, supra,* 150 Cal.App.3d at p. 242.)[3]

"The preface to the 1977 law [MORGA] which led to its enactment reiterated the state's interest in encouraging orderly growth and development and in favor of logical determination of city boundaries ([former] § 35000 [now § 56001; Stats. 1985, ch. 541, § 3, p. 1921]). It then explicitly finds that 'urban population densities . . . necessitate a broad spectrum and high level of community services and controls,' which can be best provided by a 'single governmental agency, rather than several limited purpose agencies.' [Citation.] . . . [¶] [The 1977 Act] confirms the authority of [LAFCO's] to control annexation (see [former] § 35150 [now § 56375; Stats. 1985, ch. 541, § 3, pp. 1949-1952]), and the right of residents of inhabited territories to self-determination (see [former] § 35228 [now §§

---

[3] The trial court's judgment was entered on February 20, 1986. At the time the action was commenced (Aug. 1984), three different acts—the Knox-Nisbet Act, MORGA, and the District Reorganization Act of 1965—were in effect, and all related to changes in city or special district boundaries and organizations. (See Assem. Loc. Gov. Com. Rep. (1985) Assem. Bill No. 115, pp. 1-2.) The three acts contained parallel, duplicative and in some instances inconsistent provisions. (*Id.* at p. 2.) Operative January 1, 1986, these acts were repealed and replaced with the Cortese/Knox Local Government Reorganization Act of 1985 (§ 56000 et seq.; Stats. 1985, ch. 541, §§ 1-7, pp. 1920-2024.) The intent of the Cortese/Knox Act was not to make major policy changes in the previously existing laws, but rather to eliminate duplication and inconsistencies and to incorporate all of the provisions related to changing local agency boundaries into a single body of law. (See Legis. Counsel's Dig., Assem. Bill No. 115, p. 2; Stats. 1985 (Reg. Sess.) Summary Dig., p. 166-167; Assem. Loc. Gov. Com. Rep., *op. cit. supra,* at p. 2.)

57075, 57076; Stats. 1985, ch. 541, § 3, pp. 1990-1991]), but eliminates the power of city governments to reject an annexation. Thus, under the 1977 Act, if the residents of an affected area desire to join a neighboring city, and the proposal accords with the pattern of orderly community development as envisioned by the [LAFCO], *the city and its voters no longer have the power to defeat annexation.* [¶] The foregoing history indicates that the Legislature had determined that the goals of promoting orderly and logical community development, and of providing municipal services to newly urbanized regions, *cannot adequately be met if city governments and their voters have a veto power over annexations approved by [LAFCO's].*" (Italics added, *Citizens Against Forced Annexation* v. *Local Agency Formation Com., supra,* 32 Cal.3d 828-829.)

"MORGA provides 'the sole and exclusive authority and procedure for the initiation, conduct, and completion of city incorporations, municipal reorganizations, or changes of organization.' ([Former] § 35002 [now § 56100; Stats. 1985, ch. 541, § 3, p. 1930].) ' "Change of organization" ' specifically includes annexation. ([Former] § 35027 [now § 56021; Stats 1985, ch. 541, § 3, p. 1992].) MORGA repeals and replaces earlier statutes regulating annexation and insures that LAFCO['s] will not be inhibited in exercising their authority by limiting the veto power of the city electorate. It provides for elections only in exceptional circumstances when inhabited territory is annexed (see [former] §§ 35228 [now §§ 57075, 57076; Stats. 1985, ch. 541, § 3, pp. 1990-1991], [former] 35150 [now § 56375; Stats. 1985, ch. 541, § 3, pp. 1949-1950], [former] 35231, subds. (a) and (b) [now § 56850; Stats. 1985, ch. 541, § 3, p. 1984]) and makes no provision for an election when uninhabited territory is annexed. ([Former] § 35229 [now §§ 57075, 57076; Stats. 1985, ch. 541, § 3, pp. 1990-1991].)" (*Ferrini, supra,* 150 Cal.App.3d at pp. 244-245.)

" '[W]here the statute contains express provisions indicating that the Legislature intends its regulations to be exclusive within a certain field, local government may not legislate in that field.' [Citation.] Where the Legislature has enacted a comprehensive regulatory system with express provisions for elections under limited conditions we may infer a negation of election under all other circumstances. [Citation.] A negation of elections by the city electorate in [ ] annexations may be inferred from the MORGA provisions which define the conditions under which elections are permitted." (150 Cal.App.3d at p. 247.)

Although the foregoing analysis is lengthy, the conclusion to be drawn therefrom is simple: "matters relating to the annexation of territory to a municipality are not municipal affairs." (150 Cal.App.3d at p. 246.) Thus, it is settled that annexation is a matter of statewide concern, and that a local

ordinance allowing city voters to pass judgment on proposed annexation proceedings is inconsistent with the statutory scheme for annexation.

 We now turn to the primary issue presented in this case: whether Measure A frustrates or conflicts with state annexation procedures. The City asserts the initiative does no more than permit the electorate to vote on amendments to the general plan. We read the provisions of the measure quite differently.

A telling indication that Measure A was intended to allow the voters of the City to pass judgment on proposed annexations is contained in its paragraph 5: "*Before land in the Green Belt area can be annexed by the City [of] Lodi,* an amendment to the City's Land Use Element of the General Plan must be made and approved by a majority of the people voting in a [citywide] election." (Italics added.)

Paragraph 5 could not be more clear in stating that annexation of territory in the Green Belt depends upon a favorable citywide vote. Stated differently, a favorable vote by the City's electorate allows the annexation to go forward; a negative vote stops proposed annexation in its tracks. Indeed, in its brief on appeal City concedes as much: "Under the provisions of paragraph [5] *the electorate must approve an amendment to the Land Use Element of the City's General Plan before land in the Green Belt is added to the City . . . .*" (Italics added.)

 If there were any doubt as to the intent of the initiative, it is resolved by the ballot arguments of the proponents of the Measure A initiative and the City attorney's independent analysis, all of which were submitted to the voters prior to the election.[4] The ballot arguments state in relevant part: "[¶] The control of the City's expansion and growth belongs in the hands of voters . . . . [¶] While areas outside Lodi can petition the county for annexation, only Lodi can *APPROVE* annexations. With the Green Belt Initiative, the City cannot annex without voter approval. . . . [¶] Lodi will require elections for annexations, not for each permit. The county does not permit urban growth in green belt areas without municipal services. If citizens of Lodi want annexations, they can vote on them during regular elections. . . . [¶] The initiative will not change the City code to allow high-rise apartments. The initiative stops annexations without voter approval. No developments, cheap or otherwise,

---

[4]The courts may turn to ballot arguments for the purpose of determining the probable meaning of uncertain language. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

will be allowed on the outskirts of Lodi without City approval." (Original italics.)[5]

The City attorney's independent analysis states in relevant part: [¶] "[This initiative] will add a condition to the procedures for annexation by requiring that land sought to be annexed into the City must be brought within the Land Use Element *by a vote of the people prior to the completion of the annexation procedure.*" (Italics added.)

There can be no question but that the initiative was designed to allow the electorate of the City to say "yea" or "nay" to future annexation. If the electorate defeats an amendment to the land use element of the general plan, the initiative ordinance forbids annexation regardless of a LAFCO directive to annex that is binding on the City by reason of state statutes. Thus the measure is fatally in conflict with paramount state annexation procedures.

A case closely on point is *Ferrini, supra. Ferrini* involved an annexation of approximately 200 acres to the City of San Luis Obispo under MORGA. LAFCO approved the annexation and the city complied with LAFCO directives by approving the annexation, amending its general plan and re-zoning the land. The annexation process was completed in July 1978. (150 Cal.App.3d at p. 242.)

Prior to the completion of the annexation, the voters of San Luis Obispo passed an initiative charter amendment effective June 30, 1978. Essentially, the amendment provided no annexation of territory to the city would become effective until approved by a vote of the people at a general or special election held after the final decision by the city council to annex the territory. (150 Cal.App.3d at p. 243 & fn. 2.)

Pursuant to the new charter amendment, the city scheduled an election on the annexation for November 7, 1978, three months after the annexation had become final. When the electorate voted to reject the annexation, the owners of the property filed suit claiming the charter amendment, with its voting provisions, conflicted with state annexation procedures. (150 Cal.App.3d at p. 243.)

The *Ferrini* court invalidated the charter amendment. Finding that MORGA occupied the field of annexation, the court ruled the initiative interfered with state-established process for consideration of annexations.

---

[5] The ballot argument in favor of the initiative mentions the term "annexation" six times, without once referring to the City's "general plan."

Responding to the city's argument that its charter amendment concerned a "municipal affair" which the California Constitution authorized the city to regulate, the court held that matters related to annexation of territory are of statewide concern and thus are not municipal affairs. (150 Cal.App.3d at pp. 246-250.)

*Ferrini* presents the obverse of the annexation coin. There the voters attempted to overrule a previously approved and completed annexation process. Here, the voters of Lodi have attempted to reserve the right to halt annexation before it can commence. Either scheme interferes with and frustrates state annexation procedures and cannot he sustained.

City claims that Measure A, rather than allowing the electors to preclude future annexation, does no more than allow the electorate to direct the city council with regard to whether to proceed with a proposed annexation. City notes that under the provisions of state annexation law, the city council is not required to commence an annexation proceeding. (Former § 35140 [now § 56800; Stats. 1985, ch. 541, § 3, p. 1973].) Rather, the party or parties interested in annexation are allowed to petition LAFCO directly with regard to proposed annexation. (Former § 35100 [now § 56650; Stats. 1985, ch. 541, § 3, p. 1966], former §§ 56170, 56180 [now § 56755; Stats. 1985, ch. 541, § 3, p. 1971].) City thus contends a negative vote on a proposed amendment to the general plan has the effect only of preventing the *city council* from initiating annexation, but has no effect on a landowner's right to petition LAFCO for annexation.

The City's argument is unpersuasive. As related, the initiative ordinance conflicts with state annexation statutes by forbidding an annexation directed by the LAFCO if the voters reject an amendment of the land use element of the general plan. That is the case under the initiative ordinance regardless of the source of annexation proposal. The language of the ordinance is overbroad. It is not restricted in its application to annexation proposals initiated by the City and cannot be judicially reformed. (See *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 330-331, 330 [226 Cal.Rptr. 640], fn. 15.)

Moreover, the mechanism in the ordinance for elector control over annexation decisions is itself beyond the scope of the initiative power. State land use planning laws grant legislative power to the city to enact a general plan and zoning ordinances. (Gov. Code, §§ 65100-65910.) The city council may not condition this power by enacting an ordinance requiring voter approval of such measures. A fortiori neither may the electorate through the initiative fetter the exercise of the legislative power conferred by the

statutes governing land use. (See *City and County of San Francisco* v. *Patter-son* (1988) 202 Cal.App.3d 95, 102-105 [248 Cal.Rptr. 290].)[6]

We have no quarrel with City's claim that the power of the people with respect to the initiative must be construed liberally. (*Friends of Mount Diablo* v. *County of Contra Costa* (1977) 72 Cal.App.3d 1006, 1010 [139 Cal.Rptr. 469].) The right of local initiative, however, must give way where the issue is one of paramount statewide concern. (*Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 562, 565-566 [11 Cal.Rptr. 340].)

The judgment is affirmed.

Blease, J., and Marler, J., concurred.

---

[6]City's reliance on *Yost* v. *Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152], is misplaced. The issue in *Yost* was whether "the California Coastal Act [Act] precludes a referendum on any local land use measure affecting the coastal zone which is adopted by a city council after the California Coastal Commission (Commission) has approved the city's land use plan." (*Id.* at p. 564.) The court stated the question turned on ". . . whether the Legislature intended to preempt local planning authority and thereby preempt the power of the voters to act through referendum." (*Id.* at p. 571.) There is no question but that the Act was considered by the Legislature to concern a matter of statewide importance. (*Ibid.*) Nonetheless, noting (1) the local government was to determine the precise content of each local parcel in full consultation with the Commission, (2) the Commission was not authorized to draft any part of the coastal plan, and (3) under the Act the local government could decide to be more restrictive with respect to any parcel of land provided such restrictions did not conflict with the Act, the *Yost* court concluded: "The [A]ct, therefore, leaves wide discretion to a local government not only to determine the contents of its land use plans, but to chose how to implement these plans. Under such circumstances a city is acting legislatively and its actions are subject to the normal referendum procedure." (*Id.* at pp. 571-573.)

Unlike the California Coastal Act, which the *Yost* court made clear does not "suggest preemption of local planning by the states" and thus does not preclude local agencies from acting in a legislative capacity (*id.* at p. 572), the legislative acts of a city regarding the annexation of territory are preempted by general law and thus beyond the reach of the local initiative process. (*Ferrini, supra,* 150 Cal.App.3d at pp. 246-250.)