[Civ. No. 13691. Fourth Dist., Div. Two. Nov. 19, 1974.]

CEEED et al., Plaintiffs and Appellants, v.
CALIFORNIA COASTAL ZONE CONSERVATION COMMISSION
et al., Defendants and Respondents.

310

## COUNSEL

Brundage, Neyhart, Miller, Ross & Reich, Acret & Perrochet, James M. Baratta and James Acret for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Roderick Walston, Richard C. Jacobs and Dennis A. Antenore, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

TAMURA, J.—This appeal involves the constitutionality of the Coastal Zone Conservation Act of 1972 (Pub. Resources Code, § 27000 et seq.).[1] Plaintiffs[2] brought a declaratory relief action alleging that the Act is on its face subject to numerous constitutional infirmities. The court below upheld the constitutionality of the Act against each and all of the attacks and entered judgment accordingly. Plaintiffs appeal from the judgment.

Preliminarily, we shall review the salient features of the statute under review.

Proposed as an initiative measure known as "Proposition 20," the Act was approved by the voters at the general election of November 7, 1972. It declares the California coastal zone to be a "delicately balanced ecosystem" whose preservation and protection for present and succeeding generations are of paramount concern to the state and nation. (§ 27001.) The coastal zone is defined as the area of the state seaward to the outer limits of the state's jurisdiction and landward to the nearest coastal mountain range except that in Los Angeles, Orange and San Diego counties, the landward limit is the nearest coastal mountain range or five miles from the mean high tide line, whichever distance is the shorter. (§ 27100.)

The Act creates the California Coastal Zone Conservation Commission (Commission) and six regional commissions (§§ 27200-27201) to undertake studies to determine the ecological planning principles and assumptions needed to ensure conservation and protection of coastal zone resources and, based upon such studies and in full consultation with all affected public and private interests, to develop and adopt a California Coastal Zone Conservation Plan (Coastal Zone Plan). (§§ 27001, subd. (b), 27300-27304.) Each regional commission, in cooperation with local agencies and after public hearings in each county within its region, is directed to prepare and submit its recommendations to the Commission no later than April 1, 1975. No later than December 1, 1975, the Commission must adopt and submit a Coastal Zone Plan to the Legislature for its adoption and implementation. (§ 27320.)

To ensure that developments pending formulation and adoption of a Coastal Zone Plan will be consistent with the objectives of the Act, any

[1]The statute will hereafter be referred to as the "Coastal Initiative" or the "Act." Unless otherwise indicated, all statutory references are to the Public Resources Code.

[2]Plaintiffs are an incorporated nonprofit business association (CEEED), an incorporated nonprofit construction trade association (Building Industry Association of California, Inc.) and two unincorporated building trade unions (Building & Construction Trades Councils, AFL-CIO, of Orange and Los Angeles Counties).

person seeking to develop property within an area designated as the permit area must obtain a permit from the appropriate regional commission. (§ 27400.) Subject to certain exceptions, the permit area extends seaward to the outer limit of the coastal zone and landward for a distance of 1,000 yards from the mean high tide line. (§ 27104.) Before a permit may issue, the regional commission must find that the development will not have a substantial adverse environmental or ecological effect and will be consistent with the policy and objectives of the Act. (§ 27402.) The burden of proof on all issues is upon the applicant. (§ 27402.) Any applicant or aggrieved person may appeal a decision of the regional commission to the Commission (§ 27423), and may obtain judicial review of the acts or decisions of the regional commission or the Commission (§ 27424.)

The Act, including the interim permit requirement, expires by its own terms on the 91st day after the final adjournment of the 1976 regular session of the Legislature.

The constitutional issues raised by these proceedings do not arise out of a particular factual context in the actual execution of the Act. They are presented as pure questions of law. Plaintiffs contend the Act is unconstitutional on its face for one or more of the following reasons: (1) Enactment of the measure by the initiative process violated due process rights of affected property owners; (2) the Act constitutes an invalid state intrusion into municipal affairs of chartered cities; (3) the Act constitutes an unlawful taking of private property for public purposes without just compensation; (4) the Act unlawfully delegates legislative power to the Commission; (5) the Act fails to assure procedural due process to permit applicants; and (6) the Act infringes upon the fundamental right to travel. From the discussion which follows, we have concluded that each and all of the attacks must fail and the judgment below should be affirmed.

I

Plaintiffs' first and perhaps main contention is that enactment of the measure by the initiative process rendered it void *ab initio* because that process denied affected property owners an opportunity to be heard before the measure became law.

Plaintiffs urge that opportunity to be heard before passage of a regulation substantially affecting land use is mandated by the due process clause of the Fourteenth Amendment. They cite cases holding that general law cities may not enact zoning ordinances through the initiative process because compliance with the notice and hearing requirements of the State

Zoning Law is essential to due process.[3] (*Hurst* v. *City of Burlingame,* 207 Cal. 134, 141 [277 P. 308]; *Taschner* v. *City Council,* 31 Cal.App.3d 48, 69 [107 Cal.Rptr. 214]; *People's Lobby, Inc.* v. *Board of Supervisors,* 30 Cal.App.3d 869, 874 [106 Cal.Rptr. 666]. See *City of Escondido* v. *Desert Outdoor Advertising, Inc.,* 8 Cal.3d 785, 790 [106 Cal.Rptr. 172, 505 P.2d 1012] [cert. den., 414 U.S. 828 (38 L.Ed.2d 62, 94 S.Ct. 53)].) Though they do not contend that the state is subject to the State Zoning Law, plaintiffs argue that the cited cases stand for the proposition that the minimum procedural standards therein prescribed are mandated by the due process clause. It necessarily follows, so the argument goes, that the state cannot enact zoning regulations by a process which fails to afford affected property owners procedural safeguards such as are afforded by the State Zoning Law. On the foregoing assumptions, plaintiffs contend that passage of the Act under review by the initiative process violated due process rights of affected property owners.[4] We are unpersuaded.

Unlike the ordinances invalidated in the cases cited by plaintiffs, the Coastal Initiative is not a zoning measure. It "does not zone any property but merely requires the Commission to formulate a coastal zone plan for submission to the Legislature." (*State of California* v. *Superior Court,* 12 Cal.3d 237, 255 [115 Cal.Rptr. 497, 524 P.2d 1281].) And, unlike the zoning regulations involved in the cited cases, the Coastal Initiative does not restrict land use permanently or for an indefinite period. The only land use restriction imposed by the Act and of which plaintiffs complain is the control over development in the permit area pending formulation of the Coastal Zone Plan. That restriction is simply "an interim measure to assure that developments in the coastal zone are consistent with the objectives

[3]Procedural requirements of the State Zoning Law are contained in chapter 4, title 7 of the Government Code.

[4]An underlying assumption of plaintiffs' argument is that the due process requirements of notice and opportunity to be heard applicable to the enactment of a local zoning ordinance should apply with equal force to the enactment of a state zoning regulation. It is unnecessary for us to pass upon the validity of the assumption in the case at bench since we have concluded that notice and hearing are not constitutionally required for the adoption of interim development controls pending formulation of a comprehensive land use plan either at the local or state level.

It should be noted, however, that state land use measures are a comparatively recent phenomenon (Low, *State Land Use Control: Why Pending Federal Legislation Will Help* (1974) 25 Hastings L.J. 1165) and may warrant different constitutional treatment (see Costonis, *Development Rights Transfer: An Exploratory Essay* (1973) 83 Yale L.J. 75, 80, at fn. 26). Most of the recent state laws affecting land use are designed to control or prevent uses harmful to the environment or to the natural resources of the state. Such land use controls are premised on the state's traditional power to enact legislation to prohibit or prevent activities which are or may become public nuisances and therefore, as we point out later in this opinion, the nature of the governmental interest differs substantially from that involved in conventional local zoning.

of the Act so that priceless coastal resources are not irreversibly committed to uses which would be inconsistent with the plan ultimately developed." *(State of California v. Superior Court, supra,* at p. 253.) The permit system is not even a moratorium against all interim developments. *(San Diego Coast Regional Com. v. See The Sea, Limited,* 9 Cal.3d 888, 892 [109 Cal.Rptr. 377, 513 P.2d 129]; Miller, *The California Coastal Zone Conservation Act: Cases and Controversies, 1973-74* (Stan. Environmental L. Society, June 1974) pp. 8-9.) It imposes only such minimal controls as are necessary to enable the Commission to perform its function. Adoption of a regulation imposing such interim development controls, whether at the local or state level, without affording affected property owners an opportunity to be heard, does not offend due process.

■ Local interim ordinances prohibiting acts which may conflict with the objectives of a contemplated zoning plan have been consistently upheld as valid exercises of the police power. *(Miller v. Board of Public Works,* 195 Cal. 477, 496-497 [234 P. 381, 38 A.L.R. 1479] [app. dism., 273 U.S. 781 (71 L.Ed. 889, 47 S.Ct. 460)]; *Metro Realty v. County of El Dorado,* 222 Cal.App.2d 508, 518 [35 Cal.Rptr. 480]; *Fletcher v. Porter,* 203 Cal.App.2d 313, 324 [21 Cal.Rptr. 452]; *Mang v. County of Santa Barbara,* 182 Cal.App.2d 93, 97-100 [5 Cal.Rptr. 724]; *Hunter v. Adams,* 180 Cal.App.2d 511, 520 [4 Cal.Rptr. 776]; *Lima v. Woodruff,* 107 Cal. App. 285, 287 [290 P. 480]. [For cases from other jurisdictions upholding interim zoning measures, see 30 A.L.R.3d 1196.]) The rationale of those decisions is that "it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan." *(Miller v. Board of Public Works, supra,* 195 Cal. 477, 496.)

Such interim ordinances, sometimes referred to as "stopgap" or "incubation period" ordinances, may be validly enacted without prior notice and hearing. *(Silvera v. City of South Lake Tahoe,* 3 Cal.App.3d 554, 557-558 [83 Cal.Rptr. 698]; *Metro Realty v. County of El Dorado, supra,* 222 Cal.App.2d 508, 518; *Fletcher v. Porter, supra,* 203 Cal.App.2d 313, 324; *Mang v. County of Santa Barbara, supra,* 182 Cal.App.2d 93, 100.) In urging that the State Zoning Law prescribes minimum due process procedural requirements for the enactment of a land use regulation substantially affecting property interests, plaintiffs overlook Government Code section 65858. That section specifically authorizes local agencies to adopt interim urgency ordinances to preserve the status quo pending preparation of zoning plans "[w]ithout following the procedures otherwise required

preliminary to the adoption of a zoning ordinance . . . ."[5] The constitutionality of the predecessor section (former Gov. Code, § 65806) was upheld even though it did not, as does the present section, expressly dispense with notice and hearing or limit the duration of such interim ordinances.[6] In *Metro Realty* v. *County of El Dorado, supra,* 222 Cal.App.2d 508, 518, the court said: "Government Code section 65806 neither expressly provides for notice nor does it contemplate any. The reason no notice is required is that the ordinance is, as its name states, an 'urgency' measure, the very purpose of which to preserve the status quo would be destroyed if notice and hearing were required. When the permanent plan and a zoning ordinance thereunder are before the county for adoption, notice and a hearing will be required as an essential part of procedural due process."

One important reason for less stringent procedural requirements for stopgap land use regulation is that the hardship visited on property owners is less severe than in the case of a conventional zoning ordinance permanently or indefinitely regulating land use. "Reasonableness . . . is the yardstick by which the validity of a zoning ordinance is to be measured and

---

[5]Government Code section 65858 provides: "Without following the procedures otherwise required preliminary to the adoption of a zoning ordinance, the legislative body, to protect the public safety, health and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses which may be in conflict with a contemplated zoning proposal which the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time. Such urgency measure shall require a four-fifths vote of the legislative body for adoption. Such interim ordinance shall be of no further force and effect four months from the date of adoption thereof; provided, however, that after notice pursuant to Section 65856 and public hearing, the legislative body may extend such interim ordinance for eight months and subsequently extend such interim ordinance for one year. Any such extension shall also require a four-fifths vote for adoption. Not more than the two such extensions may be adopted. Alternatively, an interim ordinance may be adopted by a four-fifths vote following notice pursuant to Section 65856 and public hearing, in which case it shall be of no further force and effect one year from the date of adoption thereof; provided, however, that after notice pursuant to Section 65856 and public hearing, the legislative body may by a four-fifths vote extend such interim ordinance for one year. When any such interim ordinance has been adopted, every subsequent ordinance adopted pursuant to this section, covering the whole or a part of the same property, shall automatically terminate and be of no further force or effect upon the termination of the first such ordinance or any extension thereof as herein provided."

[6]Former Government Code section 65806 provided: "If the planning commission, or the department of planning, in good faith, is conducting or intends to conduct studies within a reasonable time for the purpose of, or holding a hearing for the purpose of, or has held a hearing and has recommended to the legislative body the adoption of any zoning ordinance or amendment or addition thereto, or in the event that new territory may be annexed to a city, the legislative body to protect the public safety, health and welfare, may adopt, as an urgency measure, a temporary interim zoning ordinance prohibiting such and any other uses which may be in conflict with such zoning ordinance."

reasonableness in this connection is a matter of degree. A temporary restriction upon land use may be . . . a mere inconvenience where the same restriction indefinitely prolonged might possibly metamorphize into oppression." (*Metro Realty* v. *County of El Dorado, supra,* 222 Cal.App.2d 508, 516.) The permit system of the Coastal Initiative is less restrictive than many other interim measures which have been upheld. (See *State of California* v. *Superior Court, supra,* 12 Cal.3d 237, 255.) It does not suspend all development nor is it directed against enumerated uses. It prevents only such development as is inimical to the environmental and ecological objectives of the Act.

Plaintiffs suggest that had there been a hearing the following issues would have been argued: Definition of the terms "development" and "environment," powers of the Commission and burden of proof in permit hearings, and relation of the Act to municipal home rule powers. ■ It is settled law that procedural amendments to a zoning ordinance may be adopted without prior notice and hearing. (*Adler* v. *City Council,* 184 Cal. App.2d 763, 777-778 [7 Cal.Rptr. 805].) ■ Likewise, definition of the terms embodying the fundamental policy of the Act is clearly the sort of legislative or "quasi-legislative" function which may properly be exercised without prior notice and hearing. (*Wood* v. *Public Utilities Commission,* 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823] [app. dism., 404 U.S. 931 (30 L.Ed.2d 245, 92 S.Ct. 293)]; *Security-First Nat. Bk.* v. *Franchise Tax Bd.,* 55 Cal.2d 407, 419-420 [11 Cal.Rptr. 289, 359 P.2d 625] [app. dism., 368 U.S. 3 (7 L.Ed.2d 16, 82 S.Ct. 15)]; see also, *Chesebro* v. *Los Angeles Co. Dist.,* 306 U.S. 459, 464 [83 L.Ed. 921, 926, 59 S.Ct. 622].)[7]

*Scott* v. *City of Indian Wells,* 6 Cal.3d 541 [99 Cal.Rptr. 745, 492 P.2d 1137], does not undermine past decisions upholding interim land use regulations adopted without prior notice and hearing. *Scott* involved the validity of a local administrative proceeding in connection with an appli-

---

[7]While enactment of a local zoning ordinance has been called a legislative function (*Johnston* v. *City of Claremont,* 49 Cal.2d 826, 834 [323 P.2d 71]; *Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 460 [202 P.2d 38, 7 A.L.R.2d 990]), the notice and hearing requirements of the State Zoning Act have been specifically linked to its "quasi judicial character." (*Hurst* v. *City of Burlingame, supra,* 207 Cal. 134, 141.) And in *Scott* v. *City of Indian Wells,* 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137], the following passage was relied upon: "[Due process requires] at a minimum . . . that deprivation of life, liberty or property *by adjudication* be preceded by notice and opportunity for hearing. . . ." (*Mullane* v. *Central Hanover Co.,* 339 U.S. 306, 313 [94 L.Ed. 865, 873, 70 S.Ct. 652]; italics supplied.) To say that hearings are not required for a "legislative function" has been criticized as being not only misleading but an oversimplification of the problem whether a hearing is required. (1 Davis, Administrative Law Treatise (1958) § 7.03.)

cation for a conditional use permit. The precise question presented was whether owners of contiguous property in an adjoining city were entitled to notice and opportunity to be heard. In answering the question in the affirmative, our high court stated: " '[C]ommon sense and wise public policy . . . require an opportunity for property owners to be heard before ordinances which substantially affect their property rights are adopted. . . .' (*Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 464 [327 P.2d 10].) Indeed, the due process clause of the Fourteenth Amendment requires 'at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing. . . .' (*Mullane* v. *Central Hanover Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 873, 70 S.Ct. 652].) Zoning does not deprive an adjacent landowner of his property, but it is clear that the individual's interest in his property is often affected by local land use controls, and the 'root requirement' of the due process clause is 'that an individual be given an opportunity for a hearing before he is deprived of *any significant property interest,* except for extraordinary situations where some valid governmental interest . . . justifies postponing the hearing until after the event. . . .' (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 379 [28 L.Ed.2d 113, 119, 91 S.Ct. 780, 786].)" (*Scott* v. *City of Indian Wells, supra,* 6 Cal.3d 541, 548-549; italics supplied.)

We cannot accept plaintiffs' suggestion that by the quoted language the Supreme Court intended to lump together all forms of land use control irrespective of their purpose, scope or duration. *Scott* does not declare a rigid rule requiring notice and opportunity to be heard before enactment of any and all forms of land use controls. The test under *Scott* is whether the regulation results in a deprivation of "any significant property interest." Unlike an interim land use regulation, the granting of a conditional use permit could have a significant and lasting adverse effect upon adjoining properties.

The requirements of procedural due process do not turn solely on the fact that a constitutionally protected interest is affected by governmental action. They depend on a variety of complex factors such as the nature of the claimed procedural rights, the extent of interference with the private interest, and the governmental interest involved. (See *Hannah* v. *Larche,* 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321-1322, 80 S.Ct. 1502]; *Goldberg* v. *Kelly,* 397 U.S. 254, 263 [25 L.Ed.2d 287, 296, 90 S.Ct. 1011]; *City of Escondido* v. *Desert Outdoor Advertising, Inc., supra,* 8 Cal.3d 785, 791.) In *City of Escondido, supra,* the court was concerned with the validity of a city ordinance, adopted without prior notice and hearing, prohibiting certain types of outdoor advertising signs adjacent to freeways.

The court upheld the ordinance as one regulating the location of signs "so that they do not constitute nuisances and for the obvious purposes of promoting highway safety as well as enhancing community aesthetic values." (8 Cal.3d 785, 790.) It distinguished *Scott* on the ground the effect of the *Escondido* ordinance upon land use was "minimal."

The *Escondido* decision rests on the traditional power of government to regulate and even prohibit activities constituting a public nuisance. If local governmental interest in highway safety and preservation of community aesthetic values is sufficient to support enactment, without notice and hearing, of a city ordinance prohibiting billboards near freeways, it would seem necessarily to follow that the state may, without prior notice and hearing, adopt an interim permit system to preserve and protect our vital coastal physical and aesthetic resources.

The law of nuisance, called the oldest form of land use control,[8] evolved from the ancient maxim *"sic utere tuo ut alienum non laedes"*—one must so use his rights as not to infringe on the rights of others. At common law a public nuisance was defined as an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all "Her Majesty's subjects."[9] (Prosser, Torts (4th ed. 1971) § 88, p. 583.) ■ Subject to constitutional barriers against unreasonable or arbitrary action, the Legislature may declare that a specified condition or activity constitutes a public nuisance. (*City of Bakersfield* v. *Miller,* 64 Cal.2d 93, 99 [48 Cal.Rptr. 889, 410 P.2d 393] [cert. den., 384 U.S. 988 (16 L.Ed.2d 1005, 86 S.Ct. 1890)].) The power of the state to declare acts injurious to the state's natural resources to constitute a public nuisance has long been recognized in this state. (*People* v. *K. Hovden Co.,* 215 Cal. 54, 56 [8 P.2d 481].) ■ Contemporary environmental legislation represents an exercise by government of this traditional power to regulate activities in the nature of nuisances: "Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power." (*Huron Portland Cement Co.* v. *Detroit,* 362 U.S. 440, 442 [4 L.Ed.2d 852, 855, 80 S.Ct. 813, 78 A.L.R.2d 1294].) As one Pennsylvania court observed: "There is no doubt that because of the recent notoriety of the condition of the environment that there has been formed

---

[8]See Roberts, *The Right to a Decent Environment: Progress Along a Constitutional Avenue* (Law & Environment, 1970) pp. 134, 148.

[9]Civil Code section 3480 defines public nuisance as follows: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

a new public policy in this State, as well as other States of this Nation, that there is need for protection of the public against public nuisances." (*Bortz Coal Company* v. *Air Pollution Commission,* 2 Pa.Cmwlth. 441 [279 A.2d 388, 391, 48 A.L.R.3d 311].) Current legislation for environmental and ecological protection constitutes but "a sensitizing of and refinement of nuisance law." (Cal. Zoning Practice (Cont. Ed. Bar 1973 Supp.) pp. 28-29.)

Although the power to regulate nuisances and the power to enact conventional zoning ordinances are both derived from the police power, the impact of the two types of legislation on property rights differs substantially. (See *Jones* v. *City of Los Angeles,* 211 Cal. 304, 317 [295 P. 14].) ██ While statutory notice and hearing requirements must be complied with before enacting an ordinance zoning or rezoning specific property (*Hurst* v. *City of Burlingame, supra,* 207 Cal. 134, 141), due process does not mandate notice and opportunity to be heard prior to enactment of legislation declaring certain classes of activities public nuisances. (*City of Escondido* v. *Desert Outdoor Advertising, Inc., supra,* 8 Cal.3d 785, 790.) In applying nuisance legislation, notice and an opportunity for a hearing are required when the government acts to terminate an existing land use activity. (See *Leppo* v. *City of Petaluma,* 20 Cal.App.3d 711, 717-718 [97 Cal.Rptr. 840]; *Thain* v. *City of Palo Alto,* 207 Cal.App.2d 173, 189 [24 Cal.Rptr. 515].) As to proposed changes in land use, the state may require a property owner to show in a permit proceeding that such changes will not operate in the manner of a nuisance. (See *Agnew* v. *City of Los Angeles,* 190 Cal.App.2d 820, 828 [12 Cal.Rptr. 507]; *Trans-Oceanic Oil Corp.* v. *Santa Barbara,* 85 Cal.App.2d 776, 783 [194 P.2d 148].) ██ Since a hearing is not required before a nuisance standard is formulated but only when it is applied, due process rights are amply safeguarded by a hearing held on a permit application. We are satisfied, therefore, that the state need not afford affected property owners notice and an opportunity to be heard prior to *enacting* an interim permit system to control land use which threatens harm to the state's resources pending development of a comprehensive plan.

██ We also reject plaintiffs due process challenge to the provisions of the Coastal Initiative pertaining to the formulation of a Coastal Zone Plan. These provisions impose no restriction on land use. The Commission is only empowered to adopt a Coastal Zone Plan for submission to the Legislature; it is not empowered to put the plan into operation. Moreover, the Act affords private property interests opportunity to be heard and to participate in the preparation of the plan. The Commission is directed to formulate a Coastal Zone Plan "in full consultation with all affected governmental agen-

cies, *private interests,* and the general public" (§ 27001, subd. (b); italics supplied); the Commission must prepare and publish objectives, guidelines, and criteria for its study and for the preparation of local and regional recommendations (§ 27320, subd. (a)); and each regional commission must in the preparation of its recommendations hold public hearings in each county within its region (§ 27320, subd. (b)).

## II

We turn to plaintiffs' contention that the Act constitutes an invalid state intrusion into municipal affairs of chartered cities in violation of article XI, section 5, subdivision (a), of the California Constitution.[10] Specifically, it is urged that the interim permit system violates the municipal home rule concept since zoning, planning and issuance of permits for land development are matters over which chartered cities have plenary power. Further, plaintiffs argue that to require a municipality to secure Commission approval for the construction of municipal projects in the permit area unlawfully interferes with the conduct of city business. The contentions are devoid of merit.

At the outset it should be noted that the Act does not preempt local regulation pertaining to planning, zoning and permit issuance. Rather, it expressly provides that the permit required by the Act is in addition to any required by law from "any city, county, state, regional or local agency." (§ 27400.) The municipal affairs doctrine does not foreclose state legislation with respect to municipal affairs of a home rule city; it is only in the event of a conflict between local and state regulation or state preemption of local regulation that the question whether the matter regulated is a municipal affair or of statewide concern becomes determinative. (*Bishop* v. *City of San Jose,* 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137].)

In any event, assuming, arguendo, that the Act be deemed inconsistent with local regulations, it clearly involves a matter of statewide concern.

Resolution of the question whether a particular subject is solely a municipal affair or a matter of statewide concern is a judicial function. (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 62.) However, there has

---

[10]Article XI, section 5, subdivision (a), of the California Constitution provides: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

been no judicial formulation of a precise definition of the term "municipal affairs." (*Bishop* v. *City of San Jose, supra.*) The approach has been largely ad hoc, each case being resolved according to its particular facts. (Sato, *"Municipal Affairs" in California,* 60 Cal.L.Rev. 1055, 1075-1076.) But, despite the lack of specific judicial guidelines, it can be safely said that where the activity, whether municipal or private, is one which can affect persons outside the city, the state is empowered to "prohibit or regulate the externalities." (Sato, *"Municipal Affairs" in California, supra,* at p. 1085. See *City of Santa Clara* v. *Von Raesfeld,* 3 Cal.3d 239, 246-247 [90 Cal. Rptr. 8, 474 P.2d 976]; *People* ex rel. *Younger* v. *County of El Dorado,* 5 Cal.3d 480, 498 [96 Cal.Rptr. 553, 487 P.2d 1193].) In this connection courts have recognized that the impact of an activity which in times past has been purely local, may under changed conditions transcend municipal boundaries. The judicial function has therefore been discharged in light of the salutary principle that the municipal affairs concept, like other legal concepts, is not a "fixed or static quantity" but "changes with the changing conditions upon which it is to operate." (*Pac. Tel. & Tel. Co.* v. *City & County of S. F.,* 51 Cal.2d 766, 771 [336 P.2d 514]; *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480, 498; *City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239, 246-247; *Smith* v. *City of Riverside,* 34 Cal.App.3d 529, 536 [110 Cal.Rptr. 67].)

The Coastal Initiative finds and declares that the coastal zone is a "distinct and valuable natural resource belonging to all the people," that it exists as a "delicately balanced ecosystem" and "that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern to present and future residents of the state and nation." (§ 27001.) Not only are these legislative findings and declarations entitled to great weight (*People* ex rel. *Younger v. County of El Dorado, supra,* 5 Cal.3d 480, 493; *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63), they are largely matters of common knowledge, fully documented by governmental studies.[11] "The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident to even the most casual observer." (*Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111].) This is particularly true of our 1,000-mile coastline. Visual, as well as physical, access to large segments of our beaches has been obstructed by residential, commercial and industrial development. Dredging and filling of lagoons and estuaries for boat marinas to promote residential

---

[11]California Department of Navigation and Ocean Development, Comprehensive Ocean Area Plan [and] Supplement (1971); California Department of Conservation, Non-Living Resources [appendix to Comprehensive Ocean Area Plan] (1971).

development of adjacent lands have destroyed salt water marshes which have provided homes for birds, plants and animal life unique to the California Coastal Zone. Disposal of sewage and industrial and agricultural waste into the ocean has resulted in the extinction of much plant and sea life causing an imbalance in the delicate coastal ecosystem. Excessive onshore development has resulted in erosion of the shoreline and remedial actions in the form of construction of groins and revetments have affected ocean currents causing erosion elsewhere.

More than three-fourths of California's 20,000,000 population live within an hour's drive of the Pacific Ocean. Each year thousands of people are turned away from coastal state parks and campgrounds because of inadequate facilities.

Resolution of the environmental and ecological problems arising out of the competing and conflicting demands made upon the use and enjoyment of the California shoreline has proven to be beyond the capabilities of local governmental agencies. The present coastal land allocation system has failed to protect the public interest. It has been described as "largely a market-oriented system in which uses that desire access to coastal zone resources pay a rent or price per acre for the land they wish to occupy. The use which occupies each acre is therefore, in theory, the highest bidder for that acre."[12]

There is a close parallel between the regional interest which the court found to be present in the Lake Tahoe Basin in *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480, and the statewide interest in the California coastline. In upholding the Tahoe Regional Planning Compact, the court aptly stated at page 494: "Only an agency transcending local boundaries can devise, adopt and put into operation solutions for the problems besetting the region as a whole."

Although constitutional issues cannot be determined by a "consensus of current public opinion" (see *Parr* v. *Municipal Court,* 3 Cal.3d 861, 870 [92 Cal.Rptr. 153, 479 P.2d 353] [cert. den., 404 U.S. 869 (30 L.Ed.2d 113, 92 S.Ct. 46)]), or an election (*Weaver* v. *Jordan,* 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289] [cert. den., 385 U.S. 844 (17 L.Ed.2d 75, 87 S.Ct. 49)]), the fact that the Act was proposed as a statewide initiative and passed by the voters at a statewide election is evidence that the preservation and protection of the coastal resources are matters of concern to

---

[12]California Department of Navigation and Ocean Development, Comprehensive Ocean Area Plan Supplement (1971) pp. A-2-A-3.

all the people of the state. Indeed Congress has declared a "national interest in the effective management, beneficial use, protection, and development of the coastal zone." (Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 (a).)

The cases relied upon by plaintiffs are not authority for the proposition that planning and zoning are exclusively municipal affairs. *Brougher* v. *Board of Public Works,* 205 Cal. 426 [271 P. 487], merely held that the manner of enacting a zoning ordinance is a municipal affair. Similarly, *Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303 [144 P.2d 4], declared, by dictum, that the procedure for issuance of a building permit is a municipal affair. While *Fletcher* v. *Porter, supra,* 203 Cal.App.2d 313, 320, and *O'Loane* v. *O'Rourke,* 231 Cal.App.2d 774, 783 [42 Cal.Rptr. 283], contain certain strong dicta to the effect that zoning is a municipal affair and not a matter of statewide legislative concern, the actual holdings in those cases pertained to the method of enacting zoning ordinances.

Although planning and zoning in the conventional sense have traditionally been deemed municipal affairs, where the ecological and environmental impact of land use affect the people of the entire state, they can no longer remain matters of purely local concern. In *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480, an argument similar to that advanced by plaintiffs in the case at bench was rejected by the Supreme Court. It was there urged that the Tahoe Regional Planning Compact constituted an invalid legislative attempt to confer planning and zoning powers upon the Tahoe Regional Planning Agency in violation of article XI, section 11 of the California Constitution.[13] The court answered the contention by pointing out that the power conferred on the agency was to adopt and implement *regional* plans and concluded: "It is beyond dispute, then that the powers as to planning and zoning which the counties single out as violative of the Constitution are not powers local in nature and purpose." (At p. 497.) The court pointed out that the concept of municipal affairs changes with changing conditions and "[w]hen the effects of change are felt beyond the point of its immediate impact, it is fatuous to expect that controlling such changes remains a local problem to be solved by local methods. Old attitudes confer no irrevocable license to continue looking with unseeing eyes. The Compact gives the Agency power to adopt regional planning and regional zoning ordinances to solve regional problems of

[13]Article XI, section 11 of the California Constitution provides: "The Legislature may not delegate to a private person or body power to make, control, appropriate, supervise or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or assessments, or perform municipal functions."

resource management; it does not delegate to the Agency the same powers granted to the counties." (At p. 498.)

In summary, the municipal affairs concept does not preclude the state from regulating land use when necessary to further the state's interest. (See Sato, *"Municipal Affairs" in California, supra,* 60 Cal.L.Rev. 1055, 1097-1098.) The Coastal Initiative does not violate article XI, section 5, subdivision (a) of the California Constitution.

## III

The contention that the Act constitutes an unlawful taking of private property for public use without just compensation merits little discussion.

That issue was squarely decided by the Supreme Court in *State of California* v. *Superior Court, supra,* 12 Cal.3d 237, 252-255. There, following Commission denial of a permit to develop land in the permit area, the developer filed a petition for writ of mandate against the Commission alleging several causes of action including one for inverse condemnation. Among its several rulings on the Commission's demurrer to the complaint, the trial court overruled the demurrer to the inverse condemnation cause of action. As a basis for the inverse condemnation cause of action, the complaint alleged the permit was denied in order that its land would "remain undeveloped and devoted to, and held for, public use as open space land." Accepting the truth of the allegations for the purpose of the demurrer, the Supreme Court held that it nevertheless failed to state a cause of action in inverse condemnation. The court's decision was based, not on the theory that the state is immune from a suit in inverse condemnation for an alleged unconstitutional land use regulation or administrative action taken thereunder,[14] but on the substantive ground that denial of a permit on the basis that the land proposed to be developed may ultimately be designated for public use in the Coastal Zone Plan to be adopted by the Commission did not "at the time" amount to a taking of private property for public purpose without just compensation. The court noted that the rationale underlying the Coastal Initiative was based on the McAteer-Petris Act creating the San Francisco Bay Conservation and Development Commission whose constitutionality was upheld against a like attack in *Candlestick Properties,*

---

[14]For a discussion on the availability of an action for inverse condemnation as a remedy for challenging alleged unconstitutional land use regulations, see: Note, *Inverse Condemnations: Its Availability in Challenging the Validity of a Zoning Ordinance,* 26 Stan.L.Rev. 1439; Miller, *The California Coastal Zone Conservation Act: Cases and Controversies, 1973-74* (Stan. Environmental L. Society, June 1974) *supra,* pp. 18-26.

*Inc.* v. *San Francisco Bay Conservation etc. Com.*, 11 Cal.App.3d 557, 570-572 [89 Cal.Rptr. 897]. The court also relied upon the cases discussed earlier in this opinion upholding interim measures to preserve the status quo pending adoption of a comprehensive zoning plan.

## IV

Plaintiffs contend that the Act unlawfully delegates legislative power to the Commission by failing to provide adequate standards governing the exercise of the powers conferred upon it over issuance of permits. They charge that the statutory criteria set out in section 27402 confer unbridled discretion upon the Commission and are unconstitutionally vague. The contentions are devoid of merit.

The constitutional doctrine prohibiting delegation of legislative power rests on the premise that the Legislature may not abdicate its responsibility to resolve the "truly fundamental issues" by delegating that function to others or by failing to provide adequate directions for the implementation of its declared policies. (*Kugler* v. *Yocum,* 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].) Consequently, where the Legislature makes the fundamental policy decision and delegates to some other body the task of implementing that policy under adequate safeguards, there is no violation of the doctrine. (*People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480, 507 [96 Cal.Rptr. 553, 487 P.2d 1193]; *Kugler* v. *Yocum, supra,* at pp. 375-377.)

As heretofore noted the Coastal Initiative was patterned closely after the McAteer-Petris Act establishing the San Francisco Bay Conservation and Development Commission. That act declared that the uncoordinated, haphazard filling of the bay constituted a threat to navigation, wildlife and the quality of the waters of the bay and that formulation of a comprehensive plan was essential to the conservation of the bay and shoreline. It established a permit system to control the placing of fills or the extraction of submerged materials pending adoption of a comprehensive plan. (Gov. Code, §§ 66601-66604.) It provided that a permit may be granted "if the project is either (1) necessary to the health, safety, or welfare of the public in the entire bay area, or (2) of such a nature that it will not adversely affect the comprehensive plan being prepared." (Gov. Code, § 66632, subd. (d).)

In responding to an attack upon the validity of the McAteer-Petris Act on the ground of unlawful delegation of legislative powers to the Bay Conservation and Development Commission, the Court of Appeal in *Candlestick*

*Properties, Inc.* v. *San Francisco Bay Conservation etc. Com., supra,* 11 Cal.App.3d 557, 568, held: "Clearly, there has been no attempt to vest in the commissioners an arbitrary power, or an uncontrolled and unguided discretion in matters concerning the functioning of the Commission in studying the development of the San Francisco Bay and in determining whether to grant a request for a permit to fill bay lands because adequate standards have been set forth in the act." The court noted that in an earlier case arising under the act, the Supreme Court had observed: "The 'objective sought to be achieved' by the McAteer-Petris Act is depicted with remarkable clarity." (*People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville,* 69 Cal.2d 533, 544 [72 Cal.Rptr. 790, 446 P.2d 790].)

Standards for the issuance of building and land use permits couched in general health, safety or welfare terms similar to those upheld in *Candlestick* have been uniformly upheld against the charge that they confer unbridled discretion on the administrative body or are unconstitutionally vague. (*City & County of S. F.* v. *Superior Court,* 53 Cal.2d 236, 250 [1 Cal.Rptr. 158, 347 P.2d 294]; *Garavatti* v. *Fairfax Planning Com.,* 22 Cal.App.3d 145, 150 [99 Cal.Rptr. 260]; *City of Santa Clara* v. *Santa Clara Unified Sch. Dist.,* 22 Cal.App.3d 152, 163 [99 Cal.Rptr. 212]; *Mitcheltree* v. *City of Los Angeles,* 17 Cal.App.3d 791, 797 [95 Cal.Rptr. 76]; *Van Sicklen* v. *Browne,* 15 Cal.App.3d 122, 126-127 [92 Cal.Rptr. 786]; *Stoddard* v. *Edelman,* 4 Cal.App.3d 544, 548 [84 Cal.Rptr. 443].)[15]

The Coastal Initiative sets out the goals to be achieved and the standards for permit issuance with the same, if not greater, clarity than expressed in the McAteer-Petris Act. (Jackson & Baum, *Regional Planning: The Coastal Zone Initiative Analyzed in Light of the BCDC Experience,* 47 State Bar J. 427, 488-490.)[16] Before a permit is issued, the regional commission must

---

[15]*People* v. *Perez,* 214 Cal.App.2d Supp. 881 [29 Cal.Rptr. 781], cited by plaintiffs, was a criminal prosecution arising out of a violation of a zoning ordinance. Its validity as authority for the proposition that the "health, safety, or welfare" standard is unconstitutionality vague should be limited to the peculiar facts of that case. (*Orinda Homeowners Committee* v. *Board of Supervisors,* 11 Cal.App.3d 768, 776 [90 Cal.Rptr. 88, 43 A.L.R.3d 880].) *Redwood City Co. of Jehovah's Witnesses* v. *City of Menlo Park,* 167 Cal.App.2d 686 [335 P.2d 195], cannot be reconciled with the later Supreme Court decision in *City & County of S. F.* v. *Superior Court, supra,* 53 Cal.2d 236, 250. (See *Stoddard* v. *Edelman, supra,* 4 Cal.App.3d 544, 548, fn. 2.)

[16]The statutory findings and objectives and criteria for permit issuance are well summarized by Jackson and Baum, *supra,* at pages 431, 488, as follows:

"[T]he coastal zone is (a) a public natural resource and (b) a delicately balanced eco-system.

"(2) natural and scenic resources must be permanently preserved, protected and, where possible, restored. No development may, therefore, amount to a diminution of

find both: "(a) [t]hat the development will not have any substantial adverse environmental or ecological effect" and "(b) [t]hat the development is consistent with the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302." (§ 27402.)

The statutory objectives expressed in section 27302 are: preservation, restoration and enhancement of the coastal zone environment, including its aesthetic values; encouragement of optimum population of living organisms; balanced and orderly use of coastal resources; and avoidance of "irreversible and irretrievable commitments" of those resources.

The "substantial adverse environmental or ecological effect" standard is more specific than the broad "health, safety, or general welfare" guideline upheld in *Candlestick* and the cases cited above. Although application of the standard calls for the exercise of judgment and discretion, by the very nature of the legislative goals, considerable discretion must of necessity be vested in the Commission. As the court in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 271 [104 Cal.Rptr. 761, 502 P.2d 1049], said of the "significant effect on the environment" phrase in the California Environmental Quality Act: "To some extent this is inevitable in a statute which deals, as the EQA must, with questions of degree." The statutory criteria to be observed by the Commission and the regional commissions in carrying out the tasks delegated to them clearly satisfy constitutional requirements. The fact that the Commission is required to weigh complex factors in determining whether a development will have a substantial adverse environmental or ecological effect does not, as plaintiffs charge, mean that unbridled discretion has been conferred on it. ▉ A statute empowering an administrative agency to exercise a judgment of a high order in implementing legislative policy does not confer unrestricted powers. (See *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind,* 67 Cal.2d 536, 548 [63 Cal.Rptr. 21, 432 P.2d 717].)

the coastal natural and scenic resources and the proponent must also demonstrate that it will be consistent with the following planning objectives (Section 27302):

"(a) the maintenance, restoration and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values.

"(b) the [continued] existence of optimum population of all species of living organisms.

"(c) the orderly, balanced utilization and preservation, consistent with sound conservation principles, of all living and non-living coastal zone resources.

"(d) avoidance of irreversible and irretrievable commitments of coastal zone resources."

Plaintiffs' reliance upon *Bayside Timber Co.* v. *Board of Supervisors,* 20 Cal.App.3d 1 [97 Cal.Rptr. 431], is misplaced. That case involved a statute delegating rule-making powers to an administrative agency whose membership was composed of industry members. As we noted in *Allen* v. *California Board of Barber Examiners,* 25 Cal.App.3d 1014, 1020 [102 Cal.Rptr. 368], in such situations courts insist upon more stringent standards to contain and guide the exercise of delegated powers. (See *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 367 [55 Cal.Rptr. 23, 420 P.2d 735]; *State Board* v. *Thrift-D-Lux Cleaners,* 40 Cal.2d 436, 448-449 [254 P.2d 29].)

Plaintiffs seek to bring the instant case within the rationale of *Bayside Timber* and like cases by contending that the lack of standards is "magnified by the built-in bias of the commissions against development." The charge is based on section 27220 prescribing the qualifications for public members of the Commission or regional commissions.[17] The argument is specious.

The policy against interim developments in the permit area which may result in irreversible commitment of land use to purposes inconsistent with the Coastal Zone Plan ultimately to be developed is not fixed by the statutory provision for the composition of the commissions. The "bias" against uncontrolled, haphazard development along the shoreline is the declared policy of the Act. Education, training and experience in the analysis of environmental information and expertise in conservation, ecological sciences, planning and recreation are desirable, if not essential, qualifications for those to whom the administration of the Act has been committed. Commissioners possessing those qualifications will be better equipped to evaluate scientific, environmental, ecological, and planning data and render informed decisions than those lacking such training and experience. The fact, if it be a fact, that members possessing the statutory qualifications may be sympathetic towards the objectives of the Act is not a valid criticism. It is the statutory duty of the commissions to implement the policies of the Act. (§ 27001, subd. (d).) "Administrators who are unsympathetic toward the legislative program are very likely to thwart the democratic

---

[17]Section 27220 provides: "Each public member of the commission or of a regional commission shall be a person who, as a result of his training, experience and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information, to appraise resource uses in light of the policies set forth in this division, to be responsive to the scientific, social, esthetic, recreational and cultural needs of the state. Expertise in conservation, recreation, ecological and physical sciences, planning, and education shall be represented on the commission and regional commissions."

will; the way to translate legislative policies into action is to secure administrators whose honest opinions—biases—are favorable to those policies. 'It is a sine qua non of good administration that it believe in the rightness and worth of the laws it is enforcing and that it be prepared to bring to the task zeal and astuteness in finding out and making effective those purposes.' "[18] (2 Davis, Administrative Law Treatise (1958) § 12.01, p. 138; fns. omitted.)

The foregoing discussion disposes of plaintiff's subsidiary contention that the standards governing permit issuance are void for vagueness. Cases relied upon by plaintiffs all involve statutes imposing restrictions on the exercise of fundamental rights. (*Morrison* v. *State Board of Education*, 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375]; *Orloff* v. *Los Angeles Turf Club*, 36 Cal.2d 734, 739 [227 P.2d 449]; *Perez* v. *Sharp*, 32 Cal.2d 711, 728 [198 P.2d 17].)

## V

■ Plaintiff's contention that the Act fails to provide for procedural due process in permit application proceedings is without merit.

■ While administrative proceedings must comport with procedural due process, no particular form of notice or proceeding is required. A statute providing for reasonable notice and reasonable opportunity to be heard is sufficient. (*Anderson Nat. Bank* v. *Luckett*, 321 U.S. 233, 246 [88 L.Ed. 692, 704-705, 64 S.Ct. 599, 151 A.L.R. 824]; *Drummey* v. *State Bd. of Funeral Directors*, 13 Cal.2d 75, 80-81 [87 P.2d 848]; *Baker* v. *Wadsworth*, 6 Cal.App.3d 253, 264 [85 Cal.Rptr. 880].)

■ The permit procedure prescribed by the Act provides for notice and public hearing before the regional commission (§ 27420), for appeals to the Commission by an applicant or any person aggrieved by a permit approval (§ 27423, subd. (a)), for de novo public hearings by the Commission on appeals involving substantial issues (§ 27423, subd. (c)), and for judicial review of an action or decision of the Commission or regional commission by filing a petition for writ of mandate (§ 27424). The Act on its face fully guarantees procedural due process to permit applicants as well as to persons aggrieved by a decision or action of the Commission or regional commissions.

Plaintiffs complain that the Act places on the applicant the burden of

---

[18]Quoting Jaffee, *The Reform of Administrative Procedure*, 2 Pub.Ad.Rev. 141, 149.

proof on all issues in connection with a permit application. (§ 27402.) However, plaintiffs cite no authority, and we are aware of none, holding that the allocation of burden of proof on an applicant for a permit is violative of due process. The decision to place the burden on the applicant represents a reasonable exercise of legislative judgment. (See *Martin* v. *Alcoholic Bev. etc. Appeals Bd.*, 52 Cal.2d 259, 265 [341 P.2d 291]; Cal. Administrative Agency Practice (Cont. Ed. Bar 1970) § 3.54, p. 183.) The rationale for this allocation in the Coastal Initiative has been well stated by one commentator as follows: "This provision represents a departure from the common law rule that the burden of proving harm rests upon one who objects to the utilization of resources, but in the days of the formulation of this common law rule there was neither the scarcity of resources nor the sharply competitive demands placed upon them that exists today. Allocation of the burden of proof often serves as an effective tool for shaping social policies, and since it is imperative that the need for environmental protection and conservation be adequately reflected in the law, the consumer of natural resources should bear the responsibility for justifying his actions." (Note, *Saving the Seashore: Management Planning for the Coastal Zone*, 25 Hastings L.J. 191, 199-200, fns. omitted; see Krier, *Environmental Litigation and the Burden of Proof* (Law & Environment, 1970) pp. 105, 108-111.)

Plaintiffs complain that the Commission has adopted procedures on de novo hearings which so restrict the time allowed for presentation of a case as to deny a fair hearing. Whether any specific action of the Commission amounts to a denial of due process is not within the scope of the issues tendered in the present action.

## VI

Plaintiffs finally contend that the restriction on development in the permit area limits availability of housing in coastal communities and thereby infringes upon the fundamental right of persons to travel and to choose their places of residence. It is therefore urged that the validity of the interim permit system must be judged by the strict scrutiny test, i.e., the state must show that the interim control is necessary to promote a compelling governmental interest. The contention finds no support in law or reason.

The right to interstate travel is a fundamental constitutional right (*Shapiro* v. *Thompson*, 394 U.S. 618, 630 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322]) and that right includes the right to take up one's residence in any state. (*Dunn* v. *Blumstein*, 405 U.S. 330, 338 [31 L.Ed.

2d 274, 281-282, 92 S.Ct. 995].[19]) Although the right includes international travel (*Kent* v. *Dulles*, 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113]), the Supreme Court has not yet decided whether the right encompasses intrastate travel. (*Memorial Hospital* v. *Maricopa County*, 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076, 1081].) However, the Court of Appeals of the Second Circuit has held that "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." (*King* v. *New Rochelle Muncipal Housing Authority*, 442 F.2d 646, 648, fn. omitted; accord, *Wellford* v. *Battaglia*, 343 F.Supp. 143, 147; see also, *Thompson* v. *Mellon*, 9 Cal.3d 96, 101-102 [107 Cal.Rptr. 20, 507 P.2d 628].)

It does not follow, however, that all regulations affecting travel, however indirect or inconsequential, constitute invasions of the fundamental right. The right may be invoked if the regulations "unreasonably burden or restrict" the freedom of movement. (*Shapiro* v. *Thompson, supra,* 394 U.S. 618, 629 [22 L.Ed.2d 600, 612].) In a particular case the question is whether the travel inhibited is of sufficient importance to individual liberty to give rise to a constitutional violation. (See Comment, *The Supreme Court of California 1972-1973,* 62 Cal.L.Rev. 408, 440.) Thus far the United States Supreme Court has invoked the right to travel only in cases involving invidious discrimination, durational residence requirements or direct restrictions on interstate or foreign travel. (See, e.g., *Shapiro* v. *Thompson, supra*; *Kent* v. *Dulles, supra,* 357 U.S. 116; *Dunn* v. *Blumstein, supra,* 405 U.S. 330; *Memorial Hospital* v. *Maricopa County, supra,* 415 U.S. 250.) Our Supreme Court found no infringement of the right in a city charter provision requiring all officers and employees of the city to be or become residents of the city within six months after their appointment or employment. (*Ector* v. *City of Tor-*

---

[19]The United States Supreme Court has grounded the right to travel upon various provisions of the United States Constitution: The privileges and immunities clause of article IV, section 2; the privileges and immunities clause of the Fourteenth Amendment; the interstate commerce clause; and the due process clause of the Fifth Amendment. (See *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 630, fn. 8 [22 L.Ed.2d 600, 612-613]; *Kent* v. *Dulles,* 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113]; *Aptheker* v. *Secretary of State,* 378 U.S. 500 [12 L.Ed.2d 992, 84 S.Ct. 1659].) In *Shapiro,* the court, without ascribing the right to a particular clause of the Constitution, declared that it has long recognized "that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which *unreasonably burden or restrict this movement.*" (*Shapiro* v. *Thompson, supra,* at p. 629 [22 L.Ed.2d at p. 612]; italics supplied.)

*rance*, 10 Cal.3d 129, 135 [109 Cal.Rptr. 849, 514 P.2d 433] [cert. den., 415 U.S. 935 (39 L.Ed.2d 493, 94 S.Ct. 1451)].)

We fail to see how the Coastal Initiative interferes with the fundamental right to travel. It is not discriminatory; it imposes no durational residence requirement; it exacts no penalty for exercising the right to travel or to select one's place of residence. In short, it has no chilling effect on an individual's freedom of movement. To paraphrase the language of our Supreme Court in *Ector* v. *City of Torrance, supra*, 10 Cal.3d 129, 136, plaintiffs are stretching their case mightily to bring it within the scope of the fundamental right to travel.

The Pennsylvania Supreme Court cases cited by plaintiffs are inapposite. They involved municipal zoning restrictions designed to prevent future migration into a city in order to preserve for its residents its rural and secluded atmosphere. (*National Land and Investment Co.* v. *Kohn*, 419 Pa. 504 [215 A.2d 597]; *Appeal of Girsh*, 437 Pa. 237 [263 A.2d 395]; *Appeal of Kit-Mar Builders, Inc.*, 439 Pa. 466 [268 A.2d 765].) The regulations were invalidated on the ground that "[a] zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities can not be held valid." (*National Land and Investment Co.* v. *Kohn, supra*, 215 A.2d 597, 612.)

Similarly, *Construction Ind. Ass'n of Sonoma Cty.* v. *City of Petaluma*, 375 F.Supp. 574,[20] cited by plaintiffs, was concerned with a Petaluma ordinance enacted to control its growth rate. According to the court's findings and conclusions: "The express purpose and the intended and actual effects of the 'Petaluma Plan' have been to exclude substantial numbers of people who would otherwise have elected to immigrate into the city." (At p. 581.) Persuaded by the rationale of the Pennsylvania decisions discussed above, the court determined that the "Petaluma Plan" infringed upon the fundamental right to travel. Applying the strict scrutiny test, the court found that there was no compelling governmental interest justifying the plan and declared it invalid. In so doing, however, the court hastened to point out that the issue before it was not whether "local government may engage in any number of traditional zoning efforts which have been common throughout our history, such as providing for a certain density of population in a given neighborhood, or standards for the type and quality of construction, etc." (At p. 587.) In the court's words, the only issue presented was "whether

---

[20]Appeal pending, United States Court of Appeals, Ninth Judicial Circuit.

or not a municipality may claim the specific right to keep others away." (At p. 587.)[21]

It is far-fetched to suggest that the purpose of the Coastal Initiative is "to keep others away" from the permit area. Its objective is to protect, conserve and, where possible, restore the physical and aesthetic resources of the coastline for the enjoyment of all the people of the state. Rather than inhibit or restrict the right to travel, the Act seeks to promote it by providing the public greater physical and visual access to the beaches which would otherwise remain or become private enclaves of adjoining property owners. Plaintiffs' contention that the Act infringes upon the fundamental right to travel is without substance.

## CONCLUSION

Plaintiffs' charge that the Coastal Initiative represents an example of the majority unfairly "trampling" the rights of the minority through the use of the initiative process is unfounded. While on occasions the initiative process has been used in California to enact legislation violative of fundamental rights of minority groups,[22] the Coastal Initiative is not such a measure. It seeks to further legitimate and commendable governmental goals by constitutional means. It is free of the constitutional infirmities charged by plaintiffs.

Judgment is affirmed.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

---

[21]A carefully conceived time sequential plan of growth control has been upheld in New York. (*Golden* v. *Planning Board of Town of Ramapo*, 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291], app. dism., 409 U.S. 1003 [34 L.Ed.2d 294, 93 S.Ct. 436, 440]. For a discussion of various municipal growth control plans, see: Clark and Grable, *Growth Control in California: Prospects for Local Government Implementation of Timing and Sequential Control of Residential Development*, 5 Pacific L.J. 570.)

[22]See, for example, initiative measures invalidated in *Sei Fujii* v. *State of California*, 38 Cal.2d 718, 735-738 [242 P.2d 617]; *Mulkey* v. *Reitman*, 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825] [affd., *Reitman* v. *Mulkey*, 387 U.S. 369 (18 L.Ed.2d 830, 87 S.Ct. 1627)]; *Weaver* v. *Jordan*, *supra*, 64 Cal.2d 235.